UNITED STATES of America, Plaintiff-Appellee,

v.

John ROSELLI, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Maurice FRIEDMAN, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Benjamin TEITELBAUM, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Manuel JACOBS, Defendant-Appellant.

Nos. 24220, 24289, 24290, 24300.

United States Court of Appeals, Ninth Circuit.

Sept. 28, 1970.

Rehearings Denied Oct. 30, 1970.

Thomas A. Wadden, Jr. (argued), Washington, D. C., James P. Cantillon, Cantillon & Cantillon, Beverly Hills, Cal., for John Roselli.

Herman F. Selvin, Beverly Hills, Cal. (argued), Grant B. Cooper, Los Angeles, Cal., and Norman Oberstein, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for Maurice Friedman.

Clarence S. Hunt (argued), Joseph A. Ball, Douglas Dalton, Michael F. Richman, Ball, Hunt, Hart & Brown, Long Beach, Cal., for Benjamin Teitelbaum.

William Marshall Morgan (argued), Morgan, Wenzel, Lynberg, Stearns & Morris, Los Angeles, Cal., for Manuel Jacobs.

Gerald F. Uelmen (argued), and James E. Shekoyan, Asst. U. S. Attys., Robert L. Meyer, U. S. Atty., David R. Nissen, Chief, Special Prosecution Division, Los Angeles, Cal., for appellee.

Before BROWNING, DUNIWAY and HUFSTEDLER, Circuit Judges.

BROWNING, Circuit Judge:

Appellants participated in an organized scheme to cheat for profit in card games played at the Friars Club, a private social club in Beverly Hills, California. Victims were induced to join high stake gin rummy games. Observers stationed at ceiling peekholes transmitted

playing instructions to confederates in the game via electronic signaling devices.

The activity continued from the summer of 1962 to the summer of 1966. Games were "peeked" almost daily during a portion of this period. Appellants and other participants in the scheme made large profits. George Seach, an unindicted coconspirator who acted as "peekman" from late June 1962 to early April 1963, estimated the "take" during this period at $400,000.

After a long and complex trial appellants were convicted of conspiracy to violate 18 U.S.C. § 1952 (interstate travel and use of interstate facilities in aid of racketeering enterprises) and § 2314 (interstate transportation of fraudulently taken securities), and substantive violations of these sections [1] and of 26 U.S. C. § 7206 (false statements in income tax returns).

# I

Appellants' threshold contention that their conduct did not come within the terms of 18 U.S.C. § 1952, raises two issues regarding the meaning of the statute.

1. 18 U.S.C. § 1952 provides:
 "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 "(1) distribute the proceeds of any unlawful activity; or
 "(2) commit any crime of violence to further any unlawful activity; or
 "(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 "(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

Section 1952 condemns interstate travel or the use of interstate facilities in furtherance of "any unlawful activity," defined as including "any business enterprise involving gambling, liquor on which the federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States." The Government's theory is that appellants' conduct was a "business enterprise" within the meaning of the statute because it was a continuous course of conduct pursued for profit; and that it involved "gambling * * * offenses" in violation of California Penal Code section 332.[2]

Appellants' first argument is that section 1952 was intended to reach only forms of gambling that were within the province of organized crime at the time the statute was enacted, numbers, bookmaking, and dice, for example; and that gin rummy does not fall in this category.

■ It is true that section 1952 was aimed at organized crime.[3] It is also

"(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury."
18 U.S.C. § 2314 provides in part:
 "Whoever transports in interstate commerce any * * * securities or money, of the value of $5,000 or more, knowing the same to have been * * * taken by fraud; * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. California Penal Code § 332 provides:
 "Every person who by the game of 'three card monte' so called, or any other game, device, sleight of hand, pretensions to fortune telling, trick or other means whatever, by use of cards or other implements or instruments, or while betting on sides or hands of any such play or game, fraudulently obtains from another person money or property of any description, shall be punished as in case of larceny of property of like value."

3. Section 1952 was one of a package of bills referred to collectively in the Senate as the Attorney General's Program to

true that Congress intended to strike at those illicit activities that provide organized crime with its profits, particularly gambling.[4] To accomplish this purpose, however, Congress did not choose to direct the prohibitions of section 1952 against only those persons who could be shown to be members of an organized criminal group (this much appellants concede),[5] nor against only those kinds of gambling, liquor, narcotics, and prostitution offenses that racketeers were engaged in at the time Congress acted. The words of section 1952 are general; they contain no restriction to particular persons or to particular kinds of gambling, liquor, narcotics, and prostitution offenses.[6]

■ The reasons seem self-evident. It would usually be difficult, if not impossible, to prove that an individual or business was associated with or controlled by a clandestine criminal organization. It might also be difficult to prove that a particular offense was of the kind commonly engaged in by organized criminals in 1961; and, in any event, such a restriction upon the statute's coverage would provide an easy avenue for evasion through adoption of new forms and techniques of illicit trafficking. Nothing in the legislative history suggests that Congress intended prosecutors and courts to read into the Act such highly restrictive and administratively impractical exclusionary provisions. On the contrary, as we read the legislative record, Congress meant exactly what the language of section 1952 states—it deliberately chose to make the statute applicable generally, and without crippling restrictions, to any person engaged in any kind of illicit business enterprise in one of the four fields of activity specified in the statute, which experience showed to be those in which organized racketeers commonly engaged.[7]

■ Appellants contend that the "business enterprise" requirement was included in section 1952 for the very purpose of limiting the statute as they suggest. Concededly the purpose of the

Curb Organized Crime and Racketeering (Hearings before Committee on Judiciary, U.S. Senate, 87th Cong., 1st Sess., on S. 1653–1658, S. 1665) ; and in the House as Legislation Relating to Organized Crime (Hearings before Committee on Judiciary of H. of Rep., 87th Cong., 1st Sess., on H.R. 468, H.R. 3021–3023, H.R. 3246, H.R. 5630, H.R. 6571–6572, H.R. 6909, H.R. 7039). The records of both hearings contain repeated assertions that all of the bills, including S. 1952, were aimed at organized crime.

4. Senate Hearings, note 3, at 11; House Hearings at 19.

5. Appellants recognize that the statute applies to all persons and not only to persons engaged in organized crime. United States v. Barnes, 383 F.2d 287, 289 n. 2 (6th Cir. 1967). Cf. United States v. Fabrizio, 385 U.S. 263, 266–267, 87 S.Ct. 457, 17 L.Ed.2d 351 (1966).

6. When Congress wished to further restrict the categories of offenses covered by the statute it did so by express language. Thus the statute originally referred to liquor offenses generally as it now does to gambling, narcotics, and prostitution offenses ; but because this was considered too broad, language was added expressly limiting the category of liquor offenses to offenses relating to liquor "on which the Federal excise tax has not been paid." S.Rep.No.644, 87th Cong., 1st Sess., pp. 1–2. Even this language described a general field of illicit activity and did not attempt to enumerate specific offenses within that field.

7. Appellants rely heavily upon a letter written by Attorney General Robert F. Kennedy to Representative Owen Harris, which states,

"During the formulation of the proposal we were aware that to prohibit travel in furtherance of any unlawful activity would be a very broad and vague proscription which might not reach the type of activity in which we were interested. The term 'unlawful activity' was therefore defined to *limit its application to those crimes which historically have been the forte of organized crime.*" (Emphasis added.)

The Attorney General however, immediately identified the crimes he had in mind in the same general terms employed in the statute, stating, "Those crimes include gambling, liquor, narcotics, and prostitution offenses and extortion or bribery." 107 Cong.Rec. part 12, p. 16542.

"business enterprise" restriction, like that limiting the statute to illicit activity in one of the four fields in which racketeers were commonly engaged, was to focus the statute upon organized crime. Again, however, the technique Congress employed was that of stating the limitation in general terms applicable to organized crime but not confined to it. Thus Congress limited section 1952 to any "business enterprise" because the requirement of a continuous course of conduct for profit would ordinarily include the gambling operations of organized crime; [8] but, as we have said, there is nothing to suggest that Congress intended to go beyond the conditions expressed in the statute and require either that the "business enterprise" be operated by racketeers or that it be of a specific kind in which racketeers very commonly engaged at the time the statute was enacted.

Appellants rely heavily upon "interpretive technique" applied to the Anti-Racketeering Act of 1934 (18 U.S. C. § 420(a)) in United States v. Local 807, 315 U.S. 521, 535, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). Precedent, however, is of limited value in determining the meaning of another statute, differently phrased, and having its own unique legislative history. Moreover, the Court's efforts in *Local 807* to discern Congress' intent were not notably successful. See United States v. Green, 350 U.S. 415, 419, 76 S.Ct. 522, 100 L.Ed. 494 (1956).

Appellants' second argument against coverage is that section 1952 applies only to gambling that is illegal under state (or federal) law; and that California Penal Code section 332 does not make it illegal to play gin rummy for money, but only makes it illegal to commit fraud while playing gin rummy for money.[9]

8. See, e. g., Senate Hearings at 67, 282 House Hearings at 24, 26. The Attorney General is quoted in S.Rep.No.644, page 3, as stating:

"The target clearly is organized crime. The travel that would be banned is travel 'in furtherance of a business enterprise' which involves gambling, liquor, narcotics, and prostitution offenses or extortions or bribery. Obviously, we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a continuous course of conduct sufficient for it to be termed a business enterprise. * * * "

In the letter quoted in note 7, the Attorney General said:

"The type of offenses which pose such a great threat to this country due to the involvement of organized crime are those offenses which are committed regularly and as a continuous course of conduct. The term 'business enterprise involving' those offenses was used in the definition of 'unlawful activity, to connote a continous course of conduct in gambling etc. It was not the intent to include within the reach of the statute legitimate business enterprises which may touch upon offenses such as gambling."

At the House hearings, Herbert J. Miller, Criminal Division of the Department of Justice, testified:

"The use of the term 'business enterprise' limits the application of this section to a continuous and organized course of conduct in these activities, and therefore, exempts casual or occasional travel which is not directly related to such a 'business enterprise.' "

In summarizing the bill on the floor, Senator Eastland stated simply, "The use of the term 'business enterprise, requires that the activity be a continuous course of conduct." 107 Cong.Rec. part 10, p. 13943. To the same effect see H.R.Rep.No.966, 2 U.S.Code Cong. & Admin.News, 87th Cong., 1st Sess., 1961, p. 2666.

See United States v. Brennan, 394 F.2d 151, 153 (2d Cir. 1968). See also Rewis v. United States, 418 F.2d 1218 (5th Cir. 1969), where the court reversed the convictions of two defendants who did nothing more than cross a state line to place bets but affirmed the convictions of those who operated the gaming establishment.

Poker was the game involved in South v. United States, 368 F.2d 202 (5th Cir. 1966), and bingo in Dillon v. United States, 391 F.2d 433 (10th Cir. 1968). Neither is the kind of game traditionally associated with organized crime.

9. California Penal Code section 330 prohibits the playing for money of certain listed card games, "or any banking or percentage game played with cards, dice, or any device." Gin rummy is not among the games listed, and does not fall within the quoted description.

Again, the statutory language does not support appellants' argument. Section 1952 speaks not of illegal gambling, but of a more inclusive category: "gambling * * * offenses." [10]

Although Congress did not record the reason for this choice of language, it seems apparent. It is not illegal *per se* to engage in any of the four fields of activity listed in section 1952 under the laws either of the United States or of all fifty states. The statutory approach in these areas has often been regulatory rather than flatly prohibitory—particular conduct is forbidden, or conduct in particular circumstances or by particular persons. [11] If section 1952 applied only when all business activity was absolutely prohibited in the particular field, the reach of the section would be materially diminished without apparent reason in terms of the statute's purpose. There is no evidence that Congress intended this result. [12]

Appellants point out that Congress declined to adopt a suggestion that section 1952 be broadened to include interstate travel and use of interstate facilities in furtherance of criminal fraud. [13] They argue that California Penal Code section 332 simply punishes fraud, and therefore the term "gambling * * * offenses" should not be construed to include violations of section 332.

As originally enacted, the California statute dealt exclusively with cheating while gambling. By a series of amendments its scope was broadened to include fraud in certain other specified contexts. [14] It is not, however, a general fraud statute. It prohibits cheating only in the stipulated contexts, including gambling. It is expressly directed (among other things) at the regulation of gambling conduct. It expressly prohibits (among other things) fraud while gambling. We see no reason for excluding violations of this particular prohibition of section 332 from the category of "gambling * * * offenses."

Appellants call attention to exchanges at committee hearings and in floor debates that indicate that section 1952 is to apply only to illegal business enterprises, and not to illegal conduct incidental to lawful business enterprises. [15]

10. In Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9th Cir. 1963), we held that "offenses" applies to "gambling" as well as to the other three types of conduct specified in section 1952.
 That "gambling * * * offenses" is a broader term than "gambling," *see* United States v. Bergland, 318 F.2d 159, 161 (7th Cir. 1963).

11. No documentation is necessary as to the first three fields of activity. As to the fourth, *see* Nev.Rev.Stats. 201.300-.440, which regulate but do not prohibit prostitution. Raymond v. United States, 376 F.2d 581 (9th Cir. 1967).

12. Appellants call attention to occasional references to "illegal gambling" in the legislative proceedings. In context these references do not appear to us to be significant.

13. Senate Hearings at 113. *See also* 107 Cong.Rec. part 10, p. 13943.

14. The text of the prior statute is printed as an historical note following Cal.Penal Code § 332 in West's Annotated California Codes.

15. 107 Cong.Rev. parts 12, 14, pp. 16541-16542, 18815; House Hearings, pp. 335, 336, 339.
 The following excerpts from the House Hearings are illustrative:
 "[339] Mr. FOLEY [committee counsel]. At that point, may I interrupt you to clarify this.
 "Would you say that as a condition precedent, for any violation of this statute, the individual concerned must be engaged in a business enterprise which is illegal in these four categories that you are talking about?
 "Mr. MILLER [Assistant Attorney General, Department of Justice]. Absolutely.
 "Mr. FOLEY. In other words, it cannot be a legitimate business with an incidental violation resulting from the interstate travel?
 "He must first be engaged in the unlawful activity, as a business man?
 "Mr. MILLER. That is exactly the concept we tried to embody in this bill, Mr. Foley. That is why I go back to the definition of business enterprise, in order to—"

If we understand correctly, the conclusion we are asked to draw is that illegal cheating incidental to lawful gambling is not within section 1952.

Accepting the premise, the conclusion does not follow. This case does not involve cheating incidental to a lawful gambling enterprise. There was no business enterprise involved, lawful or otherwise, absent the cheating. In conception, organization, and execution, appellants' business enterprise was that of cheating at gin rummy for profit; and such a business enterprise was illegal under California Penal Code section 332. There was nothing incidental about the unlawful aspect of appellants' business.

We conclude that appellants' conduct fell within section 1952.

## II

Each appellant challenges the sufficiency of the evidence.

A few additional background facts are necessary to an understanding of the issues raised.

Count 1 of the indictment charged a conspiracy to violate 18 U.S.C. §§ 1952 and 2314; Counts 2 through 12 charged substantive violations of section 1952; Counts 13 through 19 charged substantive violations of section 2314. Counts 20 and 21 were dismissed. Counts 22 through 24 charged violations of 26 U.S.C. § 7206(1). The section 1952 charges required proof that appellants used interstate facilities and traveled in interstate commerce to promote the unlawful gambling enterprise; the section 2314 charges required proof that appellants transported in interstate commerce securities that they knew had been taken by fraud. *See* note 1.

The general theory of the Government's case was as follows.

Friedman, the prime mover in the scheme, lived in Las Vegas, Nevada, as did George Seach, who "peeked" the earlier games. Edwin Gebhard, who replaced Seach as "peekman," lived in Miami, Florida. When a rigged game was planned, Friedman telephoned Seach in Las Vegas and asked him to come to Beverly Hills. Seach then traveled to Beverly Hills and "peeked" the game. When Seach went to prison and was no longer available, appellant Jacobs telephoned Gebhard in Miami, and Gebhard traveled to Beverly Hills for the same purpose. Friedman carried checks ob-

---

* * * * *

"[339] Mr. MILLER. Mr. Chairman, in order for us to bring any prosecutive action under this statute, the first thing we are going to have to prove is that there was a business that was unlawful under the laws of the State and that business involved the specified violations here."

* * * * *

"[341] Mr. MILLER. * * * [T]his brings up the whole basic concept of this bill, that there is an organized course of conduct within the confines of a State which is unlawful. That is a condition precedent."

* * * * *

"[341] Mr. TOLL. May I follow up the answer, Mr. Miller, that you gave to Mr. Foley and to Congressman Rogers, with an illustration of a fellow that conducts a tavern in Pennsylvania, where the sale of liquor is legal; he goes to New Jersey, buys his liquor by the case, brings it to his tavern in Philadelphia, does not put the stamps on.

"That would not be a violation under this law, would it?"

"[342] Mr. MILLER. I think there has been a misconception of this statute in this regard. When we defined business enterprise as one involving gambling, liquor violation, and the like, we were thinking of the business itself as being an illegal business. Any business enterprise can have an employee or the president or someone down the line commit some act which is a violation of a statute and therefore, a crime. I mean, he might be rolling dice in the backroom for example, which is a violation of the State law.

"Now, that does not make the business enterprise, itself, an unlawful one. It merely means that one individual has committed a crime, and it has no relation to the business enterprise itself. So I do not foresee that the factual situation you outlined would come within the purview of this bill."

tained from victims in payment of losses in the "peeked" games back to Las Vegas and deposited them in his Las Vegas bank account.

■ Counts 2 through 5 of the section 1952 substantive counts are based on two Friedman-Seach telephone calls and two subsequent Seach trips from Las Vegas to Beverly Hills; Count 6 is based on travel by Friedman and appellant Roselli from Los Angeles to Las Vegas to distribute the proceeds of a "peeked" game; Counts 7 through 12 are based on three Jacobs-Gebhard telephone calls and three subsequent Gebhard trips between Miami and Beverly Hills. The seven section 2314 counts (Counts 13 through 19) are based on the transportation of eight checks to Las Vegas from Los Angeles County, or, in the process of collection through banking channels[16] from Las Vegas to Los Angeles County, or from Los Angeles County to Chicago via Las Vegas.

With this background we turn to the contentions of each appellant.

■ *Friedman.* Friedman restates, in terms of insufficiency of evidence to prove the conspiracy, the argument that the conspiracy did not violate section 1952 because the kind of gambling disclosed by the evidence (gambling at gin rummy) was lawful in California.

He also argues that the proof failed to establish the knowledge required to make out a substantive violation of section 2314—namely, knowledge that the securities transported were obtained by fraud —and hence failed to establish the knowledge required to convict him of conspiracy to violate that section. We agree, of course, that conviction of conspiracy to commit the substantive offense required proof of the knowledge essential to conviction of the substantive offense itself, for "[i]f this minimum intent is not present, no offense is contemplated" by the alleged conspirators. Develop-

ments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 939 n. 101 (1959). *See* Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Chase, 372 F.2d 453, 460 (4th Cir. 1967); Hernandez v. United States, 300 F.2d 114, 120 (1962); United States v. Gardner, 171 F.2d 753, 754 (7th Cir. 1948). On the other hand, no greater or different intent is required. *See* text at note 17. We therefore consider the question of the sufficiency of the evidence to prove knowledge in our discussion of the evidence supporting the substantive counts.

Friedman challenges the sufficiency of proof of the section 2314 substantive counts. The sentences on these counts were concurrent with those imposed on the section 1952 substantive counts except that a fine in addition to imprisonment was imposed on Counts 13, 15, and 19. We confine our attention to these three counts.

Counts 13 and 15 charged Friedman with transporting specifically described checks in interstate commerce from Los Angeles County to Las Vegas, knowing them to have been taken by fraud. Count 19 charged transportation of a check from Los Angeles County to Chicago via Las Vegas. Friedman argues that the evidence failed to establish that he knew the checks were obtained by fraud or that he transported the checks or caused them to be transported. He concedes that the checks represented winnings from Friars Club card games; his argument is really that the particular checks were not shown to have been taken by fraud because the Government did not demonstrate that they represented winnings from dishonest rather than from one of the concededly many honest games. Similarly, he contends that proof of transportation of the checks is insufficient because, although the checks were deposited in Friedman's Las Vegas account, the Government did not demon-

16. The act of depositing a check drawn on an out of state bank satisfies the requirement that the accused cause the security to be transported in interstate commerce.

Pereira v. United States, *infra*; United States v. Sheridan, 329 U.S. 379, 391, 67 S.Ct. 332, 91 L.Ed. 359 (1946).

strate that he or his agent, rather than some other person, brought the checks from Los Angeles County.

Much of Friedman's argument rests upon assumptions as to the standard governing review of the sufficiency of circumstantial evidence that we rejected in United States v. Nelson, 419 F.2d 1237 (9th Cir. 1969). Our inquiry is simply whether on the evidence the jurors "reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusion" that the particular checks were won in "peeked" games and that Friedman transported them or caused them to be transported from Los Angeles County to Las Vegas. *Id.* at 1245.

The evidence that the check involved in Count 13 originated in a "peeked" game was as follows.

As noted earlier, the evidence established a repeated pattern of Friedman's use of interstate telephone facilities to summon Seach, interstate travel by Seach, a "peeked" game, and receipt and distribution of winnings, usually by check. Telephone records showed a long distance call from Friedman in Los Angeles County to Seach in Las Vegas on February 18; money order records established Seach's presence in Los Angeles County on February 21; and Friedman testified that the check involved in Count 13 represented winnings in a game played in Beverly Hills February 20, 1963.

It is possible, on this record, that the February 20 game was honest, as Friedman argues; but the overwhelming probabilities are that it was not. On the evidence the jury could resolve the issue against Friedman "free of 'the kind of doubt that would make a person hesitate to act' in the more serious and important affairs of his own life." *Nelson, supra* at 1245.

The jury could also have found that Friedman transported the check involved in Count 13 from Los Angeles County to Las Vegas. Friedman admitted that the particular check was given to him in Los Angeles on February 21; records that he introduced showed that he traveled from Los Angeles to Las Vegas on February 22; and bank records and his own testimony established that the check was deposited in his account in Las Vegas on February 25.

The evidence supporting Count 15 is similar in character and at least as strong.

This is not true, however, of the evidence relating to Count 19. The crucial difference is that there was no proof connecting the checks referred to in Count 19 with a particular game. Since many of the games were not "peeked," the jury's determination that these checks were taken by fraud is without evidentiary support. Friedman's conviction on this count will be reversed.

■ *Teitelbaum.* Teitelbaum argues that the evidence was insufficient to support his conviction of conspiracy to violate sections 1952 and 2314 because it failed to establish that he agreed to the use of the interstate facilities and to the interstate travel and transportation, which are essential elements of the substantive offenses. We reject the argument on alternate grounds. First, the knowing use of interstate facilities is not an essential element of either the substantive offenses or the conspiracy to commit them; and, second, if it were, the evidence was sufficient to establish that Teitelbaum acted with the requisite knowledge.

The words of sections 1952 and 2314 do not suggest that Congress intended to condition liability upon knowing use of interstate facilities; their natural import is to the contrary. In both sections the requisite mental state is identified, and in neither does it include knowledge of the interstate element of the offense. *See* note 1; United States v. Bash, 258 F.Supp. 807, 809–813 (N.D.Ind.1966), aff'd sub nom. United States v. Miller, 379 F.2d 483 (7th Cir. 1967). *Compare* 18 U.S.C. §§ 1084, 1958, 2421.

We have found nothing in the legislative history that indicates a purpose to

limit sections 1952 and 2314 to violators who specifically intend to utilize interstate facilities. It is quite clear that in enacting section 1952 Congress was not concerned with regulating interstate travel or the use of interstate facilities, but rather with directly suppressing unlawful local activities from which organized crime drew its sustenance. Similarly, section 2314 is aimed at the evils of theft, fraud, and counterfeiting and not at the regulation of interstate transportation. Suppression of movement of the fruits of theft and fraud is only the means to the end of suppressing theft and fraud themselves. The sole reason for conditioning the statutes' prohibitions upon use of interstate commerce is to provide a constitutional basis for the exercise of federal power.

As the Second Circuit recently pointed out in discussing the same issue in connection with 18 U.S.C. § 1343, the purpose of statutes of this kind argues against a construction making a specific "anti-federal" intent an element of the offense:

> "The statute does not condition guilt upon knowledge that interstate communication is used. The use of interstate communication is logically no part of the crime itself. It is included in the statute merely as a ground for federal jurisdiction. The essence of the crime is the fraudulent scheme itself. Nothing is added to the guilt of the violator of the statute by reason of his having used an interstate telephone to further his scheme. There is consequently no reason at all why guilt under the statute should hinge upon

knowledge that interstate communication is used. If the wire employed is an interstate wire the requirements for federal jurisdiction are satisfied. It is wholly irrelevant to any purpose of the statute that the perpetrator of the fraud knows about the use of interstate communication." United States v. Blassingame, 427 F.2d 329 (2d Cir. 1970).[17]

Accordingly, knowing interstate travel or knowing use of an interstate facility is not an essential element of a violation of section 1952; see United States v. Miller, supra, 379 F.2d at 487; cf. Spinelli v. United States, 382 F.2d 871, 893 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Chase, 372 F.2d 453, 460 (4th Cir. 1967), and knowing interstate transportation is not an essential element of a violation of section 2314, see United States v. Kierschke, 315 F.2d 315, 318 (6th Cir. 1963); cf. Hulsey v. United States, 369 F.2d 284, 287 (5th Cir. 1966); Pritchard v. United States, 386 F.2d 760, 764 (8th Cir. 1967).

There is therefore no rational basis for holding that such knowledge is an essential element of a conspiracy to commit the offenses created by the substantive sections. The essence of the offense under the general conspiracy statute, 18 U.S.C. § 371, is an agreement by two or more persons to commit the substantive crime. In virtually all cases the meeting of minds is established simply by inference from a concert of action that produces the forbidden result. There is no apparent reason for requiring not only proof of a concert of action that includes

17. Similarly, in construing 18 U.S.C. § 641 as not requiring proof that the stolen property belonged to the United States, Judge Hufstedler said in United States v. Howey, 427 F.2d 1017 (9th Cir. 1970):
"The reason for including the requirement that the property, in fact, belongs to the Government was to state the foundation for federal jurisdiction. A defendant's knowledge of the jurisdictional fact is irrelevant, as we have held in many cases interpreting analogous statutory provisions. (E. g., United States v. Kartman (9th Cir. 1969) 417 F.2d 893; McEwen v. United States (9th Cir. 1968) 390 F.2d 47. See also United States v. Bolin (9th Cir. 1970) 423 F.2d 834.)"
See also Baker v. United States, 429 F.2d 1278 (9th Cir. 1970).
Illustrative cases interpreting analogous statutes as not requiring knowledge of the federal jurisdictional fact are collected in Judge Carter's opinion in United States v. Bolin, 423 F.2d 834, 836–837 (9th Cir. 1970).

all elements of the substantive offense, but also proof of knowledge of the jurisdictional element that is not required for conviction of the substantive offense. Such knowledge is as irrelevant to the purposes of the general conspiracy statute [18] as it is to the purposes of the substantive statutes. *See* Developments in the Law—Criminal Conspiracy, 72 Har. L.Rev. 920, 938–939 (1959).[19]

Teitelbaum's argument is that conspiracy to commit a federal substantive offense necessarily includes an agreement upon all elements of that offense. We think it sufficient that the agreement contemplates the commission of a crime and that the crime contemplated is in fact and law a federal offense.

■■■■■■ It is an element of the offenses created by the first paragraph of section 2314 that the value of the stolen securities exceeds $5,000. It would not be a defense to a charge of the substantive offense that the accused *thought* the securities worth only $2,000, if in fact their value exceeded the statutory minimum.[20] Can it be that a lack of knowledge of this jurisdictional element would

nonetheless afford a defense to a charge of conspiracy to violate section 2314?

It may be argued that because a conspiracy to commit a substantive offense may exist without actual commission of the substantive offense, conspiracies to commit state crimes might be charged under the federal conspiracy laws if there were no need to prove agreement about the aspects of the crime that confer federal jurisdiction. The simple answer is that absent the presence of the jurisdictional element, no charge can be made. The point is not that the jurisdictional element need not exist, but merely that there need be no proof that the defendants were aware of its existence.

In the second place, as we have said, Teitelbaum's conviction of conspiracy was proper even if knowledge of the interstate aspects of the illegal scheme is an essential element of the offense.

In Twitchell v. United States, 313 F.2d 425 (9th Cir. 1963), we construed the Mann Act, 18 U.S.C. §§ 2421–2422, as requiring knowledge of the illegal transportation of females in interstate commerce for immoral purposes.[21] We held,

---

18. The reasons for condemning conspiracies were stated in United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211 (1915):

> "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered."

These evils of conspiracy are present whether or not the conspirators are aware of the jurisdictional aspects of their crime.

19. Several opinions have assumed the need for such proof, but apparently without consideration of the problem. *See, e. g.,* Pereira v. United States, 347 U.S. 1, 12–13, 74 S.Ct. 358, 98 L.Ed. 435 (1954) (conspiracy to violate § 2314); United

States v. Edwards, 366 F.2d 853, 869 (2d Cir. 1966) (same); United States v. Fellabaum, 408 F.2d 220, 223–224 (7th Cir. 1969) (conspiracy to violate § 1952); United States v. Barnes, 383 F.2d 287 (6th Cir. 1967) (same).

20. The value of property taken by fraud is determined by the market value at the time and place of taking, Cave v. United States, 390 F.2d 58, 67 (8th Cir. 1968).

21. Our construction of the Mann Act in *Twitchell* is not inconsistent with the interpretation we have given to sections 1951 and 2813.

The words of the Mann Act ("Whoever *knowingly* transports in interstate or foreign commerce," etc.) strongly suggest that knowledge of the interstate transportation is an element of the offense.

Moreover, the Act's legislative history establishes that Congress' purpose was not to control local immorality but rather to deny the use of interstate facilities to a traffic viewed as evil.

Opposition to the bill that became the Mann Act was based largely on the thesis that, although cast in the form of a reg-

however, that possession of the requisite knowledge by one charged with conspiracy to violate the Act could be established by circumstantial proof that he agreed to a scheme "in which it was known that the likelihood of illegal interstate transportation was great." (429)

■ At Teitelbaum's request, the jury was instructed in accordance with the *Twitchell* formulation,[22] in a manner that completely satisfied his definition of the elements of the present offenses; and we are satisfied that the evidence was sufficient to justify the jury's conclusion that the proof of his guilt met the *Twitchell* standard.

There was direct testimony by Seach that Teitelbaum joined the conspiracy in September 1962, and participated actively in it until at least April 1963. He set up at least one rigged game, played in such games, received signals from the hidden "peekman," and shared in the spoils. As we have noted, the evidence also established, as an integral part of the scheme, a pattern of interstate phone calls, interstate travel, and interstate transportation.[23] The jury was entirely warranted in concluding, as we do, that it is inconceivable that one so intimately connected with the conspiracy over so long a period could have been unaware of these interstate activities. *See* Pereira v. United States, 347 U.S. 1, 12–13, 74

---

ulation of interstate commerce, the statute was in reality an attempt to regulate prostitution and other immoral practices exclusively within the states' police power. *See, for example,* H.R.Rep. No. 47, 61st Cong., 2d Sess., Part 2, Views of the Minority, particularly page 1, and discussion at 45 Cong.Record 809–811, 1030–1035. Proponents of the bill repeatedly assured Congress that the statute's intent was to deal solely with the evil of transportation of women and girls in interstate and foreign commerce for immoral purposes. Thus, the Report of the House Committee on Interstate and Foreign Commerce denies any purpose to interfere with state control of local immorality, insists repeatedly that the evil at which the statute is directed is the movement of women and girls in commerce—the importation of women and girls and their transportation from one state to another— and points out that the Act's prohibitions "have been so drawn that they are limited to cases in which there is an act of transportation in interstate commerce of women for purposes of prostitution." H. R.Rep. No. 47, 61st Cong., 2d Sess., pp. 1, 2, 3, 4, 5, 9, 10, 11. Identical statements appear in the Senate Report. S.Rep. No. 886, 61st Cong., 2d Sess., pp. 7, 8, 9, 10, 11. Although the bill was not debated in the Senate, the same theme ran through the debate in the House, the bill's proponents repeatedly asserting that the statute's prohibitions were aimed solely at the transportation of persons in commerce. *See particularly* the discussion of Congressmen Russell, Peters, and Sanders, who carried the burden of the legal argument for the proponents, at 45 Cong. Record 814–821, 1035–1040.

22. The full formulation in *Twitchell* is as follows:

"We think that, in a case of this kind, the evidence must show in relation to Twitchell that either:

"1. he *directly* agreed to the illegal interstate transportation, or *directly* agreed to a scheme which could not be consummated without illegal interstate transportation, or *directly* agreed to a scheme in which it was known that the likelihood of illegal interstate transportation was *great* (it being understood that such agreement need not be overt, and may be inferred from circumstantial evidence; and that directness refers not to face-to-face dealings, but to the extent of his knowledge of the purpose and scope of the conspiracy); or

"2. he evidenced his indirect agreement by substantial participation in the scheme *with actual knowledge* of the proposed, or completed, illegal interstate transportation." 313 F.2d at 429.

23. Teitelbaum points out that Search had taken an apartment in Beverly Hills by the time Teitelbaum joined the conspiracy. The evidence showed, however, that while Seach spent the week days in his apartment behind the Friars Club during the period of heaviest play, he returned to Nevada for the weekends; when play slackened, Seach remained in Las Vegas, returning to Los Angeles County only when called by Friedman or Mathes to "peek" a game. Also, Friedman made frequent trips between Nevada and California during this period.

S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Corallo, 413 F.2d 1306, 1326–1327 (2d Cir. 1969); Grimes v. United States, 379 F.2d 791, 795–796 (5th Cir. 1967); Nassif v. United States, 370 F.2d 147, 152–153 (8th Cir. 1966).

██ Teitelbaum also challenges the sufficiency of the evidence to sustain his conviction on the various counts charging substantive violations of sections 1952 and 2314. The jury was instructed, in accordance with the holding in Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that each defendant could be found guilty of the substantive offenses with which he was charged if the evidence established that he had joined the conspiracy and that the substantive offenses were committed in furtherance of it.[24] Teitelbaum does not argue that the evidence was insufficient to establish the conspiracy or his participation in it, nor does he argue that the substantive offenses were not committed pursuant to that conspiracy. Nonetheless, he advances two reasons why his convictions under the substantive counts should not be affirmed on the Pinkerton theory.

██ First, he contends, and urged the trial court to instruct the jury,

that he could be convicted under Counts 2 through 12 on the Pinkerton theory only if the jury found that he had "actual personal knowledge" of the particular interstate telephone call and of the particular interstate travel alleged in a specific count. He asserts that evidence of such knowledge was lacking. Pinkerton, however, rests upon the general principle of conspiracy law that each conspirator is responsible for the acts of the others pursuant to and in furtherance of the conspiracy (328 U.S. at 646–647, 66 S.Ct. 1180), and it is well settled that "he is liable for the acts of his co-conspirators though he was not aware of the performance of those acts, nor even of the existence of the actors." Hernandez v. United States, supra, 300 F.2d at 122.[25]

██ Teitelbaum's second argument arises because Counts 2 through 12 of the indictment alleged that he aided and abetted the commission of the offenses charged; yet the trial court instructed the jury that as to all but one of these counts, Teitelbaum could not be convicted as an aider and abettor, but could only be convicted under the Pinkerton theory because there was no evidence that he was personally aware of the interstate telephone calls and interstate trips specified

24. The instruction read:
"With respect to all of the substantive offenses charged in Counts Two through Nineteen of the indictment, if you are satisfied from the evidence beyond a reasonable doubt that at the time these substantive offenses were committed, if they were committed, the defendants named in each of the substantive counts were members of an unlawful conspiracy, as I have heretofore defined unlawful conspiracy to you, then you may find the defendants guilty on all of the substantive counts, provided the acts referred to in the substantive counts were acts in furtherance of the unlawful conspiracy, which you have found from the evidence existed."
Of course, Pinkerton applies only when the intent required for conviction of the conspiracy encompasses the intent required for conviction of the substantive offenses (Hernandez v. United States, 300 F.2d 114, 121, n. 17 (9th Cir. 1952)); and, as we have seen, this condition is satisfied in the present case.

25. The only support for Teitelbaum's contention is found in dictum in United States v. Barrow, 229 F.Supp. 722, 733–734 (E.D.Pa.1964), rev'd in part on other grounds, 363 F.2d 62 (3rd Cir. 1966). The Barrow court did not consider the rationale upon which we rest our contrary conclusion.
The ruling in Barrow related to another problem, whether the jury should be instructed that a conspirator may not be convicted of a substantive offense committed by a co-conspirator if commission of the offense "could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Pinkerton, 328 U.S. at 648, 66 S.Ct. at 1184. While this additional language may be added to the instruction if requested, it does not appear in the instruction approved in Pinkerton, see 328 U.S. at 645, n. 6, 66 S.Ct. 1180, and its omission is not reversible error. United States v. Edwards, 366 F.2d 853, 869 (2d Cir. 1966).

in these counts. Teitelbaum contends that because the indictment alleged that he aided and abetted the commission of the substantive offenses, the court's instruction that he could be convicted of the substantive offenses under the *Pinkerton* theory "broadened" the indictment and denied him his Fifth Amendment right to be held to answer only "on a presentment or indictment of a Grand Jury." A conspirator, however, may be convicted on the *Pinkerton* theory without a specific allegation that a coconspirator committed the offense in furtherance of the conspiracy.[26]

■ Hence, the only possible basis for objection by Teitelbaum is that the wording of the indictment somehow misled him to his prejudice. He appears to complain because the allegation that he aided and abetted the commission of the offenses caused him to come forward with a defense, and a successful one, specifically directed to that theory of liability, but since he would have been exposed to liability on this theory in any event, the particularization did him no harm.[27] He does not suggest, even now, that he failed to present any evidence or argument that he might have presented had the indictment omitted the specific charge of aiding and abetting, or had it spelled out the *Pinkerton* theory of liability. It was clear from the face of the indictment that the conspiracy charge and the substantive charges were based on a single course of conduct by the alleged conspirators, including Teitelbaum. Charged as a conspirator, he was on notice that he must defend against that charge, and he did so, vigorously. Charged as an aider and abettor, he was on notice to establish, if he could, any possible legal or factual defense to the substantive offenses. The remaining element of *Pinkerton* liability—that the substantive offenses, if committed, were acts in furtherance of the conspiracy—was not subject to argument in the context of this case.

■ *Roselli*. Roselli's principal contention is that statements by Friedman that implicated Roselli should have been excluded as hearsay because there was insufficient evidence independent of the statements to support the trial judge's required preliminary finding that Roselli was engaged in a joint undertaking with the declarants. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Carbo v. United States, 314 F.2d 718, 735–738 (9th Cir. 1963).

We disagree.

Roselli was identified as being present at a number of rigged games, although not as a player.

The proceeds of one "peeked" game included three checks totaling $31,500 given to Teitelbaum by one of the victims. At Teitelbaum's request, the victim subsequently replaced one of the checks with a new one for $10,000 made out to "J. Martinez," a fictitious name. Friedman ultimately gave this same check to his secretary in Las Vegas and instructed her to collect it and give the proceeds to Roselli. She delivered to Roselli an envelope containing $10,000 in cash. He gave her a $100 gratuity in return. Friedman denied that this represented Roselli's share of the proceeds of the rigged game and testified that Roselli was merely acting as a messenger to pay a debt Friedman owed to a

---

**26.** No such allegation is mentioned in *Pinkerton* nor in any of the decisions following it. Of course, the jury must be instructed on the *Pinkerton* theory of liability if a conviction is to be sustained on that theory. Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Thomas v. United States, 398 F.2d 531, 541 (5th Cir. 1967).

**27.** An accused charged with an offense may be convicted on evidence showing that he aided and abetted another in the commission of that offense, even though the indictment does not allege this theory of liability; hence the language of the indictment charging him with aiding and abetting was simply surplusage. *E. g.*, United States v. Lester, 363 F.2d 68, 72 (6th Cir. 1966); Lambert v. United States, 226 F.2d 602 (5th Cir. 1955).

third party. The trial court, however, was not required to believe this improbable explanation.

Seach testified that about this time Roselli was present at a meeting between Seach and Friedman. When Seach described a new peeking device he had developed, Friedman suggested that Seach "leave it with us, and we'll put a share of the profits away for you." Seach refused, remarking, "It's hard enough to get your money when you're there, John, isn't it?" Roselli replied, "That's right"; and continued, "From now on I'm going to be there."

This evidence was sufficient to support the trial court's conclusion that a prima facie case involving Roselli in the joint enterprise had been made out. Friedman's statements in furtherance of the common enterprise were therefore admissible against Roselli, and this additional evidence furnished adequate support for the jury's verdict against him under Count 1.[28]

■ Roselli was also convicted of substantive violations stemming from transportation of the "J. Martinez" check to Las Vegas from Los Angeles.[29] There was ample proof, if believed, to convince the jury that Friedman was responsible for transporting the check to Las Vegas in furtherance of the conspiracy, and thus to justify Roselli's conviction of the substantive counts as Friedman's co-conspirator.

■ Finally, Roselli was convicted under Count 22 of willfully filing a false income tax return. The jury, as well as the judge, could have rejected Friedman's testimony and concluded that the $10,000 Roselli received in Las Vegas was not Friedman's money but Roselli's, and it is undisputed that Roselli failed to declare it as income.

*Jacobs.* Appellant Jacobs became involved about the time Mathes and Seach, the two Government witnesses who participated in the scheme, were leaving. Although, most of the evidence about Jacobs' participation is therefore circumstantial and considerably less detailed than that relating to the other appellants, we are entirely satisfied that it was sufficient to support the verdict.

Two problems merit discussion.

■ The Government introduced telephone records reflecting calls on particular dates between phones in Jacobs' residence in Los Angeles, California, and Gebhard's residence in Miami, Florida, to prove the three Jacobs-Gebhard telephone calls underlying Counts 7, 9, and 11.[30] The Government concedes that there is no direct proof identifying the caller, the recipient, or what was said. Jacobs argues that for this reason the evidence was insufficient, citing Osborne v. United States, 371 F.2d 913 (9th Cir. 1967).[31]

*Osborne* does not hold that the parties and subject matter must be established by direct evidence, but only that the proof of those facts, direct or circumstantial, must be sufficient. To avoid repetition, we defer summarizing the relevant circumstantial evidence in this case to our later discussion of the problem of variance. That evidence was sufficient, in our opinion, to permit the jury to conclude that the calls were made by Jacobs and received by Gebhard, that their substance was a summons to Gebhard to "peek" games at the Friars Club,

28. Both Mathes and Seach testified that Friedman had told them that Roselli knew about the "peek" and had been cut in as a partner.

29. Counts 6, 16, 17, and 18 were all based upon the interstate transportation of the "Martinez" check.

30. Gebhard's subsequent trips to Los Angeles formed the basis of Counts 8, 10, and 12.

31. Friedman's related argument that the telephone records were not admissible as evidence of conspiracy without foundation proof identifying the parties and subject matter is without merit. United States v. Novick, 124 F.2d 107, 110 (2d Cir. 1941); United States v. Gallo, 123 F.2d 229, 231 (2d Cir. 1941).

and that Gebhard then came to Los Angeles for this purpose.

■ The second problem involves the charge in Count 24 that Jacobs willfully filed a false income tax return that did not report income "in excess of $20,-000" won from card-playing activities at the Friars Club. The Government's evidence showed payments of $24,750 to Jacobs by a single loser in the year in question. Jacobs did declare $17,000 in income from "sporting enterprises," and the jury was instructed that "sporting enterprises" was an acceptable term for gambling income. Hence, the undisclosed balance established by the evidence was $7,750 rather than "in excess of $20,000" as alleged. Jacobs argues that the Government was bound by its allegation. It is enough that the Government establishes that substantial income went unreported. United States v. Johnson, 319 U.S. 503, 517–518, 63 S.Ct. 1233, 87 L. Ed. 1546 (1943).

### III

■ Appellants Roselli and Jacobs argue that the Government alleged one conspiracy but proved at least two and that this variance requires reversal under Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Roselli rests his argument upon the assertion that the Government's evidence connected him with only one of the many rigged games. His evaluation of the record is not accurate, but even if it were, that he participated in only one of the series of rigged games would not establish that the particular game reflected a separate conspiracy rather than one incident in a continuing conspiracy encompassing the series of games. The only difference between the game to which Roselli refers and the games preceding and following it is that this game marked the point at which Roselli began to share in the proceeds. The same conspirators cheated in the same way before that game and after. In *Kotteakos*, there were in fact separate conspiracies

operating independently of each other, though involving a common person.

Jacobs' contention is somewhat different. He argues that the Government's proof showed at least two conspiracies separated in time. He asserts that there was no evidence that the rigged games continued between July of 1963 when Seach was imprisoned and January of 1965 when Gebhard was observed sawing a hole in the roof of the Friars Club, and that the only early conspirator who was connected with the post-1965 period was Friedman.

We believe the evidence was sufficient to permit the jury to conclude that the conspiracy continued after Seach's last game.

Shortly after Seach "peeked" his last game Jacobs wired funds to Gebhard in Miami. Although Seach was gone, the games went on, and the two main victims, Briskin and Karl, continued to lose about eighty percent of the time, the same rate of loss they had experienced while Seach was "peeking" the games. In September of 1963 a new card room was opened on the third floor of the Friars Club. New "peekholes" were installed; Briskin and Karl continued to lose. Two hatches on the roof of the Friars Club provided access to the "peekholes." The first was observed in August of 1964. Gebhard was seen sawing a hole for the second in July of 1965. Physical evidence established that sometime after May of 1965 Gebhard was in the airspace between the roof and the third floor ceiling where the "peekholes" were cut. The pattern of telephone calls, travel, gambling beneath the "peekholes," and distribution of proceeds, which characterized the Seach period, continued after Seach's departure. There was proof of telephone calls from Jacobs' residence in Los Angeles to Gebhard's residence in Miami, followed by trips by Gebhard to Los Angeles, and by the presence of Friedman, Jacobs, and Gebhard in Los Angeles in October and November, 1964, December, 1964 and January, 1965, March and April, 1965, and October and November, 1965. Games were played

under the "peekholes" during these periods, and transfers of funds occurred between Jacobs and Friedman (February 1965), Friedman, Jacobs, and Roselli (April 1965), and Friedman and Jacobs (June 1966). Seach testified to admissions by Jacobs and Friedman in July 1966 that indicated that sometime earlier, after Seach's imprisonment, Gebhard had "peeked" games in which Jacobs and Friedman participated.

Whether there was one conspiracy or two was a question of fact for the jury. United States v. Crosby, 294 F.2d 928, 945 (2d Cir. 1961). Giving permissible weight to the presumption of continuity of a once-established conspiracy,[32] the jury could conclude that but a single overall scheme was involved, having unity of purpose and means and a continuity of membership (though the individual participants varied and the periods of their activity overlapped), and that this continuing concert of action, though occasionally quiescent, was never wholly abandoned. There was a marked difference in the detail and directness of the proof about the early and later periods, but, as we have noted, this is attributable not to a change in the scheme but to the fact that participants testified as to the early activity in detail, while the evidence of later activity was largely circumstantial.

Because the evidence established a single conspiracy it is immaterial, if true, that Jacobs participated only in its later stages.

## IV

Appellants Roselli, Teitelbaum, and Jacobs were separately charged, in Counts 22, 23, and 24, with failing to report income received from card-playing activities at the Friars Club. Teitelbaum and Roselli argue that, under Federal Rule of Criminal Procedure 8, the tax counts were improperly joined (1) with each other, and (2) with the other counts of the indictment, and should have been severed. In addition, all three assert error in the denial of their motions under Federal Rule of Criminal Procedure 14 for separate trial on all counts on the ground that a joint trial was prejudicial.

We consider first whether joinder was permissible under Rule 8.

 We set aside appellants' argument that joinder was improper because the tax charges were not similar in character to the charges under sections 1952 and 2314. Joinder of charges against multiple defendants is controlled by Rule 8(b), not by Rule 8(a). Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990, 992 (1966); King v. United States, 355 F.2d 700, 704 (1st Cir. 1966); see Williamson v. United States, 310 F.2d 192, 197 (9th Cir. 1962); Wright, Federal Practice and Procedure, Vol. 1, § 144. Under Rule 8 (b), the sole basis for joinder of charges against multiple defendants is that the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." It is irrelevant that Rule 8(a) permits charges "of the same or similar character" to be joined against a single defendant, even though they do not arise out of the same or connected transactions. Charges against multiple defendants may not be joined merely because they are similar in character; Cupo, supra, 359 F.2d at 993; King, supra, 355 F.2d at 703; Williamson, supra; Wright, (supra at 325), and even dissimilar charges may be joined against multiple defendants if they arise out of the same series of transactions constituting an offense or offenses. See, e. g., Scheve v. United States, 87 U.S.App.D.C. 289, 184 F.2d 695 (1950) (keeping a gaming table and aggravated assault). Except for this difference, the test for joinder under the two provisions is the same. 8 Moore's Federal Practice 8–23, 8–24.

32. United States v. Perlstein, 126 F.2d 789, 798 (3d Cir. 1942); Marino v. United States, 91 F.2d 691, 695 (9th Cir. 1937); Coates v. United States, 59 F.2d 173, 174 (9th Cir. 1932).

██ Appellants concede that, on the Government's theory of the evidence, both the conspiracy count and the substantive counts under sections 1952 and 2314 grew out of a series of transactions relating to the "peeked" games at the Friars Club that were participated in by all defendants and therefore that these counts were properly joined, subject to defendants' right to relief under Rule 14 on a showing of undue prejudice. They contend, however, that the alleged failure of each of them to report his winnings from the illegal enterprise [33] was an individual act and not part of the series of acts in which all defendants participated.

██ It is implicit in the language of Rule 8(b) that so long as all defendants participate in a series of acts constituting an offense or offenses, the offenses and defendants may be joined even though not all defendants participated in every act constituting each joined offense.[34] Rule 8(b)'s "goal of maximum trial convenience consistent with minimum prejudice"[35] is best served by permitting initial joinder of charges against multiple defendants whenever the common activity consti-

tutes a substantial portion of the proof of the joined charges.

██ Under this standard, joinder was permissible here. Proof of the cheating at the Friars Club and the distribution of the proceeds was a substantial part of the proof of both the conspiracy charge and the substantive charges under sections 1952 and 2314. It was also a substantial part of the evidence supporting the tax charges, which required proof of the receipt of income as well as proof that such income was not reported. Indeed, the only Government evidence applicable solely to the tax counts was the tax return of each appellant for the year in question. Because of this large area of overlapping proof, trial economy and convenience were served by joinder, and because the area of proof that would be inadmissible at separate trials was relatively small, any additional prejudice to the defendants from the joinder was slight.

In United States v. Granello, 365 F.2d 990 (2d Cir. 1966), it was held impermissible to join charges against two defendants for failing to report income simply because they had earned the unreported income in joint business activi-

33. The indictment alleged that the unreported income came "from card playing activities at the Friars' Club." The evidence relied upon by the Government at trial however, related to unreported income of Teitelbaum and Roselli from "peeked" games. Although Rule 8(b) standards are stated in terms of required allegations, a conviction will not be reversed on appeal if the evidence at trial establishes that joinder was proper; for even if the rule is read literally to require that the basis for joinder appear on the face of the pleading, the error would then be harmless. Griffin v. United States, 272 F.2d 801, 802–803 (5th Cir. 1959).

34. The closing sentence of Rule 8(b) reads: "Such defendants may be charged in one or more counts together or separately *and all of the defendants need not be charged in each count.*" (Emphasis added.) *See* Wright, Federal Practice and Procedure, Vol. 1, at 324; Williamson v. United States, 310 F.2d 192, 197 n. 16 (9th Cir. 1962); Kivette v. United States, 230

F.2d 749, 753 (5th Cir. 1956); Scheve v. United States, 87 U.S.App.D.C. 289, 184 F.2d 695, 696 (1950).

35. 8 Moore's Federal Practice at 8–36. In Bruton v. United States, 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court quoted with approval the following language from Daley v. United States, 231 F.2d 123, 125 (1st Cir. 1956):
"The rules are designed to promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of defendants to a fair trial."
*See also*, King v. United States, 355 F.2d 700, 703 (1st Cir. 1966); Cataneo v. United States, 167 F.2d 820, 823 (4th Cir. 1948); 8 Moore's Federal Practice 8–3, 8–36; ABA Minimum Standards for Criminal Justice, Joinder and Severance, 15–16 (Approved Draft 1968). *Cf.* Baker v. United States, 131 U.S.App.D.C. 7, 401 F.2d 958, 971 (1968) (Rule 8(a)).

ty. The court based its conclusion on the language of Rule 8(b), which permits joinder only if defendants participated in the same acts or series of acts "constituting an offense or offenses." In *Granello*, the joint business activity was not in itself illegal. In the present case, however, the joint activity from which the unreported income was received constituted an offense or offenses in itself.[36]

*Granello* does not hold that the joined offenses, or any of them, must be based entirely upon the acts or series of acts in which all defendants participated, and it is clear that they need not. For example, in Turner v. United States, 222 F.2d 926 (4th Cir. 1955), joinder of separate charges of failing to report income against two individuals was permitted where the defendants earned the unreported income in a partnership business.[37] In Daley v. United States, 231 F.2d 123 (1st Cir. 1956), the court upheld joint trial of defendants individually charged with failure to register, and with failure to pay an occupational tax,

before engaging in a gambling business, as required by 26 U.S.C. (I.R.C.1939), §§ 3285, 3291. Each individual was required to register and to pay the occupational tax separately. Joinder was permitted because all of the defendants participated in the same gambling business that "constituted the concluding element of the two offenses" (126).[38] Evans v. United States, 349 F.2d 653 (5th Cir. 1965), is to the same effect. In Scheve v. United States, *supra*, 184 F.2d 695, all jointly tried defendants were charged with keeping a gaming table, and one defendant was charged with assaulting a disgruntled customer.

Baker v. United States, *supra*, 401 F. 2d 958, is also relevant here, although it involved joinder of charges against a single defendant.[39] The court held that charges of larceny and interstate transportation of fraudulently obtained funds were properly joined with a charge of evading income tax for the year of the theft, because

"In determining whether offenses are based on 'acts or transactions con-

36. Hence, it is unnecessary to decide whether we agree with *Granello*. On the one hand, the goal of trial economy is served by joinder whenever the overlapping evidence arising out of joint activity is great, whether or not that joint activity is in and of itself illegal. On the other hand, confining joinder of defendants to cases in which the series of acts or transactions in which all participate is itself illegal limits the individual's exposure to joint trial to situations that he is more clearly on notice to avoid.

37. *Granello* distinguishes *Turner* on the ground that in *Turner* the defendants had jointly falsified the partnership records and filed false partnership returns that were the basis of the individual returns.

38. The court rested its decision upon considerations of trial economy:
"Considering the participation by the defendants in the same gambling business as 'the same act or transaction,' is it the same act or transaction 'constituting an offense or offenses,' within the meaning of Rule 8(b)? In a hypercritical reading of the rule, it may be suggested that proof of a particular defendant's participation in such act or transaction does not of itself establish the

offense charged, for this particular defendant might or might not, have paid the occupational tax, or complied with the registration requirements. But Rules 13 and 8(b) are not to be read so narrowly. See Cataneo v. United States, 4 Cir. 1948, 167 F.2d 820, Jordan v. United States, 5 Cir. 1941, 120 F.2d 65. The rules are designed to promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial. Rule 8(b) on its face contemplates the situation where some of the evidence might be admissible against one defendant and not against a co-defendant at a single trial, for in its concluding clause the rule provides that 'all of the defendants need not be charged in each count.'" (231 F.2d at 125).

39. As noted earlier in the text, although Rule 8(a) allows joinder of offenses solely on the ground that they are of "same or similar character," while Rule 8(b) does not, the tests under the two are otherwise indistinguishable. 8 Moore, *supra*, 8-23—8-24. The "same or similar character" basis for joinder was not involved in *Baker*.

nected together,' the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once. In view of this rationale, and the fact that the tax evasion charge could not be proved without establishing the theft as well, the district court's conclusion that the offenses were 'connected together' was fully warranted." (401 F.2d at 971–972).

■ If we are wrong in our interpretation of Rule 8(b), and joinder of the tax counts with the others was improper under the rule, we would hold the error harmless. Although it is frequently said that a joinder not authorized by Rule 8 is prejudicial per se,[40] an examination of the cases indicates that prejudice is assumed without further inquiry only where two or more defendants have been tried jointly on wholly unrelated charges. Baker v. United States, *supra*, 401 F.2d at 974.[41] We agree with the reasoning that led the Courts of Appeals for the District of Columbia and Second Circuits to conclude that Rule 52 is applicable to misjoinder. Baker v. United States, *supra* at 973; United States v. Granello, *supra*, 365 F.2d at 995. *See also* Scheve v. United States, *supra*, 184 F.2d 695, 696.

As noted earlier, with the sole exception of the tax returns, all evidence admitted at the joint trial in this case would have been admissible at a separate trial of the conspiracy and substantive charges under sections 2314 and 1952.

In this context, the additional disclosure that some of the participants had failed to include a small part of the profits from the illicit scheme in their income tax returns would hardly seem calculated appreciably to prejudice the defendants. And, since the greater part of the proof of the rigged games would also have been admissible at a separate trial of the tax charge of each individual defendant, it is difficult to believe that their conviction on those charges was due in any part to the mere fact that the trial was joint. *Cf.* Baker v. United States, *supra*, 401 F.2d at 972–973; United States v. Granello, *supra*, 365 F. 2d at 995.

■ We also reject appellants' contention that even if joinder were permissible under Rule 8, the trial court should have granted their Rule 14 motions for severance and separate trials.[42] As appellants recognize, such a motion calls for an exercise of the trial court's discretion, and the court's ruling is subject to reversal only when that discretion is abused. United States v. De La Cruz Bellinger, 422 F.2d 723 (9th Cir. 1970); Tillman v. United States, 406 F. 2d 930 (5th Cir. 1969); Parker v. United States, 404 F.2d 1193, 1194 (9th Cir. 1968); Brown v. United States, 126 U.S. App.D.C. 134, 375 F.2d 310 (1966); Fernandez v. United States, 329 F.2d 899, 906 (9th Cir. 1964). We find no abuse of discretion here.

Appellants' basic contention is that the issues were so complex, the trial so lengthy, and the evidence admissible against only one or some of the four so voluminous and prejudicial, that the

---

40. Wright, *supra*, 325; Moore, *supra*, 8–4, 8–14, and cases cited note 41.

41. *See, e. g.,* Metheany v. United States, 365 F.2d 90, 94 (9th Cir. 1966); United States v. Granello, *supra*; Cupo v. United States, *supra*; King v. United States, *supra*; Ward v. United States, 110 U.S. App.D.C. 136, 289 F.2d 877, 878 (1961); Ingram v. United States, 272 F.2d 567, 569, 570 (4th Cir. 1959); *see* McElroy v. United States, 164 U.S. 76, 80–81, 17 S.Ct. 31, 41 L.Ed. 355 (1896).

42. Federal Rules of Criminal Procedure 14 states:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. * * *"

jury could not make a fair assessment of each individual defendant's guilt. But the story was simple—a half-dozen men, using various interstate facilities, cheated at cards at the Friars Club intermittently over a period of years. The factual issues were not complex—though the charges were fairly numerous, they were based upon only a few incidents. The extreme length of the trial was in large part because of the elaborate and exhaustive defense. The court carefully instructed the jury about the compartmentalization of the evidence as to each defendant. With only four defendants and relatively few critical factual incidents to consider, an exhaustive presentation by both sides over an extended period, and careful guidance by the court, we think the jury was competent to accord each appellant fair and impartial consideration.

Roselli, citing de Luna v. United States, 308 F.2d 140 (5th Cir. 1962), argues that severance was required because Friedman and Teitelbaum elected to testify while he did not. In that case, however, the defenses of the accused were antagonistic. The testifying defendant sought to establish that de Luna, and not he, had committed the crime, and his counsel commented unfavorably upon de Luna's failure to take the stand. The defenses of Friedman and Teitelbaum were not antagonistic to that of Roselli; indeed, Friedman's testimony tended to exculpate Roselli; and there was no comment from any quarter on Roselli's failure to testify.

### V

Appellants argue that they were prejudiced by a variety of errors in the examination of witnesses and admission of evidence.

■ A. They complain that the jury was made aware that two witnesses subpoenaed by the Government (Gebhard and Snyder), and a defense witness under Government cross-examination (Lewin), declined to answer questions on the ground that their testimony might incriminate them. Appellants rely upon the two lines of reasoning outlined in Namet v. United States, 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1936):

> "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a *conscious* and *flagrant* attempt to build its case out of inferences arising from use of the testimonial privilege. * * * A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inference from a witness' refusal to answer added *critical weight* to the prosecutor's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." (Emphasis added.)

The incident involving Lewin merits only brief consideration. Both lines of reasoning discussed in *Namet* rest on the premise that the inference that the jury may draw from the witness' refusal to testify is of substantial importance to the Government's case. Lewin's testimony concerned only a collateral issue of minor significance. The questions he refused to answer on cross-examination were directed to matters of impeachment, not issues in the case, and did not involve the defendants in any way. Even if the jury inferred that Lewin's answers would have incriminated him, the inference could have had only the most remote and indirect relevance to defendants' guilt.

Turning to Gebhard and Snyder, we first reject any suggestion of prosecutorial misconduct. Although the Government was advised that both men would refuse to answer, the record negates any conscious effort by the Government "to build its case out of inference arising from use of the testimonial privilege."

Snyder was questioned before the jury because the court and counsel for both sides believed that he could not be punished for contempt unless he refused to answer in the regular course of the trial. He was asked and refused to answer but

one question. The Government made no effort to exploit the incident.

Gebhard was never questioned before the jury. However, because he had been mentioned frequently in the testimony and had appeared in court for identification by other witnesses, the Government expressed concern that unless the jury was advised of the reason for his failure to testify it might infer that his testimony would have been adverse to the Government's case. Acting on the authority of United States v. Romero, 249 F.2d 371, 375 (2d Cir. 1957) (*see also* United States v. Gernie, 252 F.2d 664, 669 (2d Cir. 1958)), the court instructed the jury as indicated in the margin.[43] Thus, the prosecution's motivation was wholly defensive; there is nothing to support a charge that the Government sought to draw from Gebhard's silence an inference favorable to its case.[44]

Since we conclude that there was no prosecutorial misconduct, the question is whether, in the particular circumstances of this case, the inference that the jury may have drawn when Gebhard and Snyder refused to testify "added critical weight to the prosecutor's case in a form not subject to cross-examination." We think not.

There is no doubt that the matters to which Gebhard would have testified were vital, for it was the Government's theory that Gebhard acted as "peekman" after Seach's imprisonment, perhaps assisted on one occasion by Snyder. Nonetheless, we think it unlikely that the jury drew an inference from their silence that added "critical weight" to the Government's case. As we have noted, Gebhard was asked no questions in the presence of the jury. Snyder was asked a damaging question, but only one, and his potential as a witness appeared relatively limited. The Government had abundant evidence, albeit circumstantial, establishing the elements of the offense to which Gebhard's testimony might have related. The incidents were not calculated to impress the jury; the questioning of Snyder and the court's instruction regarding Gebhard occupy two or three pages in a transcript of over sixteen thousand pages —a few moments in a six-month trial. The jury was admonished, immediately and forcefully, that each witness' refusal was of his own doing, and that no inference was to be drawn from it, one way or the other.[45]

 We wish to add, however, that we do not approve the practice of ques-

43. "THE COURT: Ladies and gentlemen of the jury, during the course of the case you have seen from time to time a man referred to as Pete Gebhard.

"Mr. Gebhard was called as a witness. He refused to testify, and has, insofar as this case is concerned, retired from the courtroom.

"You are not to consider this fact in any connection whatsoever in your determination of the issues that will be presented before you. You are not to speculate as to what his testimony might have been had he testified one way or the other.

"I only mention this in order that you might not otherwise wonder why Mr. Gebhard, whom you have seen, has not testified. This was by his own determination, and it had nothing to do with the Government or any of the defendants. This was his own doing. So you will be governed accordingly."

44. In context, the remark in closing argument to which appellants point is simply a reference to the fact that evidence con-

cerning the later period of the conspiracy was largely circumstantial.

45. The cases relied upon by appellants are distinguishable. In Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724, (1964), the prosecution was allowed to ask an alleged accomplice of the defendant seven leading questions that effectively described the crime. There were few witnesses and the trial was short (less than three days). The testimony sought would have corroborated that of the Government's only other witness. The trial judge's admonitory instruction was weak and confusing.

In Robbins v. Small, 371 F.2d 793 (1st Cir. 1967), the prosecution was allowed to ask the witness fourteen leading questions, including many extremely prejudicial to the defendant's case. In Sanders v. United States, 373 F.2d 735 (9th Cir. 1967), the witness was asked at least ten incriminating questions. In United States v. Maloney, 262 F.2d 535 (2d Cir. 1959), the trial court failed to give the admonitory instruction.

tioning a witness before the jury after he has indicated that he will decline to testify, as Snyder had, nor of advising the jury that a witness has refused to testify, as was done with Gebhard, when the defense had not sought to use the witness' silence to the Government's disadvantage. As Judge Hand said in United States v. Maloney, 262 F.2d 535, 537 (2d Cir. 1959), when a potential Government witness indicates that he will refuse to testify, the situation is one in which either advising the jury of this fact or not doing so "results in prejudice to one side or the other; and it is impossible, so far as we can see, to lay down any general rule that will cover all instances." Judge Hand concluded, however, and we agree, that unless and until the defense seeks to exploit the situation to its advantage, the balance must be struck in favor of the accused. On the other hand, "if the accused at any stage of the trial should argue that the failure to call such a witness indicated that he would not support the charge, the prosecution should be free to disclose the fact that it had reason to suppose that the witness would refuse." *Id.*

■ B. Appellants suggest that the Government exceeded the admittedly broad scope of proper cross-examination in attempting to impeach the witnesses Lewin and Carson. If the Government pressed too hard, the error does not justify reversal. The purpose of Lewin's testimony, as we have just noted, was to impeach the Government witness Seach

by contradicting Seach's testimony as to a fact collateral to the offenses charged. Carson was also called to impeach Seach by offering a lay opinion about Seach's mental health. Assuming that these witnesses were unfairly impeached so that their credibility was to some extent improperly diminished, reducing somewhat the tendency of their testimony to impeach Seach, in the context of this record the ultimate impact of the error upon the jury's determinations was surely de minimis.[46]

■ C. Appellants complain of the admission of testimony about their participation in other "peek" operations. Much of this evidence came in as proper redirect examination of Seach after appellants had opened the issue in cross-examination. Moreover, the evidence was relevant to the issues, of intent, knowledge, and the existence of a continuing "business enterprise" (Cohen v. United States, 378 F.2d 751, 758–759 (9th Cir. 1967); Hernandez v. United States, 370 F.2d 171, 172 (9th Cir. 1966)),[47] and we cannot say that the trial judge erred in the exercise of the wide discretion vested in him to determine whether its probative value exceeded its prejudicial effect. United States v. Feldman, 136 F.2d 394, 399 (2d Cir. 1943).[48]

D. Appellant Roselli moved before trial to suppress evidence obtained through Government-conducted electronic surveillance. On the Government's assurance

46. We also reject under Rule 52(a) Teitelbaum's argument that it was error to require him to produce tape recordings of telephone conversations between himself and Government witness Mathes. Teitelbaum generally asserts that the tapes contain prejudicial material, pointing to nothing in particular. We have read a transcript of the tapes. They are liberally laced with protestations of innocence and exculpatory remarks by Teitelbaum, and include nothing we would regard as prejudicial to him.

47. Testimony about the so-called "Beverly Hills Hotel Incident" was also relevant to the question of when Teitelbaum first met Seach, which became important in

connection with Teitelbaum's efforts to impeach Seach.

48. Contrary to Teitelbaum's contention, we are satisfied that the jury understood from the trial judge's admonition that evidence of these "peek" operations was to be considered only against those defendants who were said to have participated in a particular operation.

We also reject Jacobs' argument regarding the testimony of cheating at the "Old" Friars Club. It was stricken as too remote and the jury was admonished to disregard it; and neither the content nor context suggests any reason for doubting the efficacy of these remedial steps.

that no fruits of the surveillance would be used at trial, the trial court elected to hold the suppression hearing after trial. Roselli claims it was error to refuse a pretrial hearing, that the hearing conducted was inadequate, and that the Government failed to establish that the evidence admitted at trial was free of taint. Essentially the same issues were decided against Roselli in United States v. Sacco, 428 F.2d 264 (9th Cir. 1970) and no argument raised on the present appeal has shaken our confidence in that decision.

E. We find no reversible error, if error at all, in the admission of the various documents to which Jacobs objected on the grounds that they were not properly authenticated, that a proper foundation was not laid, or that they were irrelevant or immaterial.

## VI

We cannot agree with appellants that the Government's closing argument exceeded the bounds of proper advocacy to a significant degree, or contained language that might have been interpreted as a comment on the failure of Jacobs and Roselli to testify.

## VII

Nor are appellants' objections to the instructions well taken.

The elements of the section 1952 offense were fully and correctly described; appellants' arguments to the contrary rest largely upon an interpretation of the statute that we have rejected. Their objections to the *Pinkerton* instruction also raise issues dealt with earlier in this opinion.

With one exception, the objections Friedman now makes to the section 2314 instructions were not raised below, and the one objection made to the trial judge led to a prompt and, in our view, entirely adequate corrective instruction. Reading the instructions as a whole, Friedman's argument that they deprived him of the benefit of the rule that guilt must be

shown beyond a reasonable doubt approaches the frivolous.

Teitelbaum's objection to instructions to the effect that, once established, a defendant's membership in a conspiracy having continuity is presumed to continue until he demonstrates to the contrary, is without substance. Hyde v. United States, 225 U.S. 347, 369, 32 S. Ct. 793, 56 L.Ed. 1114 (1912); United States v. Goldberg, 401 F.2d 644, 648 (2d Cir. 1968); United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964).

Friedman's conviction on Count 19 is reversed. The judgments are otherwise affirmed.