UNITED STATES of America,
Appellee,

v.

Salvatore GRANELLO, a/k/a Sally
Burns, and Hyman Levine, a/k/a
George Levine, Appellants.

Nos. 404, 405, Dockets 30005, 30006.

United States Court of Appeals
Second Circuit.

Argued May 27, 1966.

Decided Aug. 3, 1966.

See also D.C., 243 F.Supp. 325.

Daniel H. Greenberg, Irwin L. Germaise, New York City, for appellant, Hyman Levine.

Irwin Klein, New York City, for appellant, Salvatore Granello.

Michael W. Mitchell, Washington, D. C. (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Otto G. Obermaier, John E. Sprizzo, Douglas E. Liebhafsky, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge.

Salvatore Granello and Hyman Levine appeal from their convictions, after a joint trial before Judge Dimock and a jury in the District Court for the Southern District of New York, for wilfully failing to file income tax returns for 1956 and 1957 in violation of 26 U.S.C. § 7203. We affirm.

Charges against the defendants were first made in a five count information. Counts 1 and 2 alleged Granello's failure to file returns in 1956 and 1957 despite the receipt of gross income approximating $118,500 and $97,000 in those years. Counts 3 and 4 made the same charges against Levine, whose gross income for the two years was claimed to approximate $132,750 and $97,000. Count 5 alleged a conspiracy among Granello, Levine and Lowell M. Birrell to violate § 7203 by failing to make the returns and to supply required information to the Internal Revenue Service. A later three count indictment charged both defendants with unlawfully attempting to evade taxes for 1957 in violation of 26 U.S.C. § 7201 and also a conspiracy to defraud the United States by impeding the lawful functions of the Treasury Department in collecting income taxes by concealing the sources of their income and the nature of their business activities.

The information and the indictment were consolidated by consent, and were first tried before Judge Murphy and a jury. The conspiracy count in the information was dismissed on the Govern-

ment's motion, and the similar count in the indictment on the defendants'. The jury hung on the substantive counts and a mistrial was declared. After the case was reassigned to Judge Dimock, Granello made a motion for a severance, which was denied. At the second trial, the jury found each defendant guilty on each of the two substantive counts in the information; it hung on the substantive counts of the indictment. Judge Dimock imposed fines and consecutive sentences of one year, the maximum term of imprisonment permitted, on each count on which defendants were convicted.

The Goverment's claim that Granello and Levine received large capital gains in 1956 and 1957 from their sale of stock of Pacheco Petroleum Company, a Cuban corporation, was supported by evidence which warranted the jury in finding as follows: In May 1955 Pacheco, which then had outstanding only 5,000 shares held by its founder Trueba, issued 2,000,-000 shares to Levine for oil leases on properties in Cuba acquired without cost to himself. In August, at the next Pacheco stockholders' meeting, Levine was elected treasurer and Granello chairman of the executive board;[1] the new officers adopted a resolution for the issuance of another 1,000,000 shares for leases on mining concessions. Early in September Granello entered into a leasing agreement with Maniabon Petroleum Company under which he obtained oil concessions to be operated on a 12% royalty basis; Granello deposited with Maniabon 125,-000 shares of Pacheco stock, these being part of the 2,000,000 previously issued to Levine, on a stipulation that they would be returned on his furnishing a $25,000 bond. Granello immediately assigned these leases to Pacheco, which issued 1,000,000 shares to him and assumed his obligations under the contract.

Early in 1956 Granello and Levine sold 2,000,000 of their Pacheco shares to Birrell, whom they had met in connection with efforts to expoit the leases, for cash

and shares in one of Birrell's companies, Lomega Gold Mines, Ltd.; Birrell guaranteed that the Lomega shares would be saleable so that defendants' total yield would be in excess of $400,000. Payments aggregating $120,000 were made in 1956, sometimes by checks to the order of Granello or Levine, sometimes by funds from checks drawn to cash. The Lomega stock, however, proved not to be saleable at the expected price, and defendants pressed Birrell for satisfaction. A signed agreement, dated December 7, 1956, provided that Birrell would immediately give Granello and Levine $50,000 in cash, five checks dated December 7 aggregating $25,000, and undated checks for $75,000 which were not to be cashed without notice to Birrell; that commencing February 5, 1957 and monthly thereafter Birrell would pay $30,000 to defendants jointly until satisfaction of the amount originally due and owing— an estimated maximum of $450,000 but subject to adjustments to be settled six months later; and that security for this obligation would be provided on or before February 5, 1957. The checks promised for December 1956 were issued payable to Levine and Granello and deposited that month. Payments of $194,000 were received in 1957. With the inclusion of a sale of 30,000 shares to one James Cooper, defendants received from the sale of Pacheco stock $226,550 in 1956 and $194,000 in 1957. If this was divided equally and treated as long-term capital gain on the sale of property having a zero basis, each would have owed some $23,000 in taxes for 1956 and $17,000 to $18,000 for 1957. No returns were filed or taxes paid by either.

 Little time need be spent on defendants' contention that no taxable income was shown. One claim is that because they did not own 80% of the company's voting stock as required by § 368 of the Internal Revenue Code, the 1955 transactions between them and Pacheco were not tax free reorganizations

---

1. The records of the meeting showed Granello as holding 668,000 of the 2,000,000 shares originally issued to Levine.

preserving their zero basis and postponing all tax consequences until the later years when the stock was actually sold, but gave rise to taxable income then and there. Insofar as this argument measures control with reference to unissued Pacheco shares, it is too frivolous to warrant discussion. That alone is enough to dispose of Levine's claim since even if he were acting separately from Granello as he contends he must be found to have been, the transfer of the leases would have made him the owner of all Pacheco's shares except the 5,000 then held by Trueba. But evidence that we have recited, and more that we have not, amply warranted a finding that Levine and Granello were equal partners in the entire Pacheco venture, a fact which, as will shortly be shown, the Government was not prevented from proving. Indeed it is immaterial whether the receipts were divided equally; the Government traced $70,900 to Granello in 1956 and $67,000 in 1957, so that even if all the balance went to Levine, each had gross income far exceeding the $600 requiring a return. 26 U.S.C. § 6012. There is likewise no merit in the claim that the entire purchase price was received in 1956 so that no income was realized in 1957 with the consequence that the counts relating to the later year must fall. Birrell's promise "was not embodied in a note or other evidence of indebtedness possessing the element of negotiability and freely transferable." Ennis v. C. I. R., 17 T.C. 465, 470 (1951), see Bedell v. C. I. R., 30 F.2d 622, 624 (2 Cir. 1929), and the deferred payments were includible in income only when received. 2 Mertens, Federal Income Taxation § 11.05, at 9, 12–13; § 12.124, at 376–77. Indeed, the exact price was still uncertain at the end of 1956.

■ Defendants argue with great earnestness that the dismissal at the first trial of the conspiracy counts charging them with having combined to conceal and not to report their income precluded the Government from showing at the second trial that they had combined to make it. Mere statement of the contention sufficiently reveals its fallacy. The doctrine of collateral estoppel "makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision." Yates v. United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1086, 1 L.Ed.2d 1356 (1957). Even if we assume that the dismissal of the conspiracy counts was on the merits, the essential determination was simply that Granello and Levine had not unlawfully agreed to conceal their income or to default in filing returns—not at all that they had not agreed to join in the lawful activity of producing the income by obtaining the Pacheco shares and then selling them. The decision in Sealfon v. United States, 332 U.S. 575, 580, 68 S.Ct. 237, 240, 92 L.Ed. 180 (1948), rested on the special circumstance that the Government's case at the second trial against the alleged aider and abettor of the substantive crime required it to prove the very agreement relied on to show conspiracy "which was necessarily adjudicated in the former trial to be non-existent." See also United States v. Kramer, 289 F.2d 909, 915–920 (2 Cir. 1961).

■ This brings us to the most substantial point in the case, the denial of Granello's motion for severance after the mistrial. F.R.Cr.P. 8(b) permits a joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." We have difficulty with the Government's argument that this permitted joinder of the two defendants even apart from the conspiracy count. Whereas Rule 8(a) allows joinder of offenses if these are of the same or similar character or "are based on the same act or transaction or on two or more transactions connected together or constituting part of a common scheme or plan," Rule 8(b) relating to joinder of defendants is more narrowly drawn. See 8 Moore (Cipes), Federal Practice § 8.06 at 8–22 & 8–23 (1965); Orfield, Joinder in Federal Criminal Procedure, 26 F.R.D. 23 (1961). Under Rule 8(b) it

is not enough that the defendants participated in the same act or transaction or series of them; they must have engaged in the same act or series of acts "constituting an offense or offenses." [2] The very basis so clearly sustaining the Government's position against foreclosure by collateral estoppel, namely, that acts or transactions relating to the earning of income were not what was previously adjudicated to have not occurred, cuts against it here; joint participation in the "series of acts or transactions" resulting in the receipt of income for the Pacheco shares does not satisfy Rule 8(b) since they did not constitute an offense. The decision in Turner v. United States, 222 F.2d 926 (4 Cir.), cert. denied, 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742 (1955), on which the Government heavily relies, is inapposite because the court regarded the case as one in which the indictments there consolidated had charged the defendants with jointly falsifying records and filing false returns of partnership income whence the false individual returns sprang; this likewise seems to have been the rationale of United States v. Manno, 118 F.Supp. 511, 514 (N.D.Ill.1954). See also Cataneo v. United States, 167 F.2d 820 (4 Cir. 1948). And at least one court has rejected the Government's position on facts which from the meager report do not appear reasonably distinguishable from those before us. United States v. Harvick, 153 F.Supp. 696 (D.N.D.1957).

The Government is thus forced to fall back on a second line of defense, namely, that joinder of the defendants initially was within Rule 8(b) because of the conspiracy counts in the information and indictment and that this relegated them to Rule 14 providing discretionary relief from prejudicial joinder. The Government is surely right on the first point, and under the rule in Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), would also be on the second if the issue before us were a refusal to grant a motion to sever at the first trial after dismissal of the conspiracy counts when the case was ready for submission to the jury. Although it has been argued that *Schaffer* ought not to be applied to a retrial on substantive counts after the charges of joint participation have been eliminated by a prior adjudication, 8 Moore, supra at 8–39 & 8–40,[3] this court apparently has held otherwise. Application of Gottesman, 332 F.2d 975 (2 Cir. 1964);[4] see 8 Moore, supra. We are unable to follow Granello's attempt to distinguish that decision on the basis that the perjury counts against the co-defendants concerned the same subject matter, namely, a meeting with Garfield and Swann at the same time and place; whether Gottesman and Cohn had or had not attended the meeting, this would not have been an offense and, with the conspiracy count out of the case, the charges were of two separate perjuries regarding its occurrence—just as here the charges are of separate wilful failures to report the jointly earned income. On the other hand, the *per curiam* decision in *Gottesman* may well have been based in some part on doubt as to how far Judge Dawson's dismissal of the conspiracy count at the close of the first trial represented a considered determination that sufficient evidence of joint action had not been produced, as distinguished

---

**2.** Despite the rather inept drafting, we read the "constituting" clause as applying to "the same act or transaction" as well as to "the same series of acts or transactions." But see United States v. Charnay, 211 F.Supp. 904, 905 (S.D. N.Y.1962).

**3.** The argument is quite persuasive where the trier of the facts has determined the lack of joint criminal activity or the judge has clearly held the evidence insufficient to permit such a determination.

What gives pause is that trial judges so often withdraw conspiracy counts from the jury without detailed analysis of the evidence and simply to avoid confusion, either with the consent of the prosecution or without serious objection.

**4.** Judge Hays thought that the case was not appropriate for mandamus and that the petition should have been denied on that ground without reaching the merits. 332 F.2d at 976.

from an attempt to simplify the jury's task.[5] When double jeopardy rather than collateral estoppel is the sole bar to submitting the conspiracy charge to a second jury, there is a stronger case under *Schaffer* for not granting severance as a matter of right; in such a case a court might still be able to look to the original information or indictment as characterizing the crime and affording a basis for joinder under Rule 8(b) even though the guarantee against double jeopardy prevents conviction for conspiring.

We need not debate, however, whether *Gottesman* should be thus limited or decide what the result would be in this case if it were. Even if we were to assume *arguendo* that Granello's motion to sever after the mistrial should have been granted, we perceive no prejudice from its denial. The evidence of joint action by the two defendants was sufficient to have permitted the Government to introduce at separate trials the same proof that it offered at the joint one; despite the common misconception, the admissibility of acts of a partner rests on basic principles of agency and not on the presence of a conspiracy count. See United States v. Pugliese, 153 F.2d 497, 500 (2 Cir. 1945); United States v. Annunziato, 293 F.2d 373, 378 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); United States v. Costello, 352 F.2d 848, 854 n. 4 (2 Cir. 1965), cert. granted on another point, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966). The jury here was carefully instructed that the issues as to each defendant must be determined separately.

■■ We see no reason why the undoubted truth that an appeal claiming misjoinder under Rule 8(b) raises a question of law in the strict sense, whereas an appeal from denial of severance under Rule 14 normally raises only one of abuse of discretion, should carry exemption from the harmless error rule, F.R.Cr.P. 52(a), as a corollary. We do not consider Ingram v. United States, 272 F.2d 567 (4 Cir. 1959), approvingly cited in 8 Moore, supra at 8–14 & 8–15, as so holding, to establish any such general principle; the joinder in that case was of two sets of defendants whose offenses were "in no way connected," and the Government's introduction against one set of proof wholly irrelevant to the other was plainly prejudicial. Similarly the decision in McElroy v. United States, 164 U.S. 76, 80–81, 17 S.Ct. 31, 41 L.Ed. 355 (1896), with respect to the defendants named in all the indictments consolidated for trial, rested upon a conclusion that they may indeed have been embarrassed and prejudiced in their defense, or the attention of the jury distracted, by the evidence of "distinct and independent transactions." See also Ward v. United States, 110 U.S.App. D.C. 136, 289 F.2d 877 (1961). In the *Schaffer* case the Court implied that the harmless error rule is applicable to questions of improper joinder when it observed that the rule was not reached there because "the joinder was proper under Rule 8(b)" and no error was shown. 362 U.S. at 517, 80 S.Ct at 949. Here, where the Government could have proved the receipt of income by both on the trial of either and the jury was appropriately instructed, no prejudice from the joinder could have occurred.

■ Much of the Government's evidence to show defendants' receipt of income consisted of cancelled checks, checkbooks, and other records obtained by a seizure of Birrell's books and papers in July and August of 1959. Granello and Levine sought, seasonably but unsuccessfully, to suppress this evidence against them because of the alleged illegality of the search and seizure under the Fourth Amendment. When, after the

---

5. The Government's affidavit opposing mandamus recited that "Judge Dawson stated on the record that he was dismissing the count solely as a matter of law and not on the facts, and stated that he thought the submission of the conspiracy count would confuse the jury." See note 3 supra and 8 Moore, Federal Practice at 8–40 n. 56. Acquittal of both defendants at the second trial mooted the issue as to severance.

verdict, another district judge granted a motion by Birrell for suppression of the seized records, United States v. Birrell, 242 F.Supp. 191 (S.D.N.Y.1965), Granello and Levine renewed their application before Judge Dimock as a motion in arrest of judgment; he denied it on the ground that they lacked standing to avail themselves of any illegality in the Government's seizure of Birrell's records, 243 F.Supp. 325 (1965).

We need not reiterate what we have recently said as to standing in United States v. Bozza, 365 F.2d 206, 222–223 (2 Cir. 1966), or repeat the citation of the authorities there assembled. Granello and Levine have not shown that any of the papers held to have been unlawfully seized from Birrell were theirs; he stood toward them not as a partner but as a buyer. If Birrell had regained the seized records before their trial, these would have been subject to subpoena for a purpose not prejudicial to him. Defendants are mistaken in their reliance on the statement in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed 319, 24 A.L.R. 1426 (1920), "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all"; Mr. Justice Holmes was speaking of an effort to require owners of records illegally seized by the Government to produce them after their return pursuant to a subpoena prepared from copies made during the illegal possession. Defendants' complaint is simply that the Government's awareness of their crime and its knowledge of how to establish it were fruits of a seizure that has been found at *nisi prius* to be illegal as against someone else. Sustaining this position would mean that if an illegal seizure of one man's records revealed a plot by others to kill a high public official or to overthrow the Government, the Fourth Amendment would prevent use of the records against the plotters. We cannot believe the founders meant to go so far; it suffices that the seized property and

its fruits should be sterilized as against the victims of the unlawful action. See Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960).

The defendants next challenge several rulings that they insist undermined their efforts to mount an effective defense. The judge, having ascertained by an examination outside the presence of the jury that Birrell would claim his privilege against self-incrimination with respect to any question by the prosecution or the defense, ruled that the Government could not call him, cf. Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). He also stated that if the defendants chose to call Birrell, he would tell the jury that the Government had been precluded from calling him because of his declared refusal to testify, thereby eliminating any adverse inference the jury might otherwise draw from its failure. This in no way deprived the defendants of their right to call Birrell; it deprived them only of power to make or suggest an unfair argument if they did. The judge's instructing defense counsel that they were not to argue dismissal of the conspiracy count was likewise proper in the interest of preventing confusion. Defendants' numerous other objections to Judge Dimock's eminently fair conduct of the trial do not warrant discussion.

The final complaint concerns the denial of a motion for a new trial on the ground of newly discovered evidence. Several months after the conviction Granello's counsel wrote Birrell, stating Granello had advised him that monies received by him and Levine from Birrell represented not the purchase price of the stock but advances to them as agents for Pacheco in connection with Lomega's acquisition of its assets. He inquired whether Birrell's examination of the suppressed files had disclosed any records "which would clarify the true nature of such transactions between the two corporations and my client and his co-defendant." The letter also asked whether Birrell had found electric logs of

the Pacheco wells. Birrell promptly gave an affimative answer as to the logs; in response to the more important question, he enclosed a copy he had made of minutes of a Lomega board meeting held September 20, 1956. These recited that the president of Lomega had "prearranged" the acquisition of the assets of Pacheco by a subsidiary as suggested at a prior Lomega board meeting in May and, to that end, Lomega had advanced $205,000 to Birrell & Larson and $75,000 to S & C Trading Co., Inc.; it was voted that Birrell & Larson and S & C Trading Co. should reimburse Lomega for these sums and look to the subsidiary for payment. On the basis of this correspondence, defendants moved for discovery of the Birrell files and an evidentiary hearing in support of a motion for a new trial. Construing F.R.Cr.P. 16 as including a post-trial application for discovery, Judge Dimock denied the motion; defendants did not press their application for a new trial apart from discovery and an evidentiary hearing, and this was dismissed.

The locating of the electric logs among Birrell's papers clearly afforded no basis for post-trial relief. Evidence at the trial had indicated these were in the Government's possession and could have been produced on request. Moreover, the only purpose that would have been served by their production would be to show the value of the leases at the time of their transfer to Pacheco; this was irrelevant since, as we have held, the basis for defendants' Pacheco stock was the cost of the leases, namely nothing, rather than their value at the date of transfer. The judge was likewise justified in concluding that the Lomega minutes afforded no sufficient probability of exculpation to warrant the relief sought. Acquisition of Pacheco's assets by a subsidiary of Lomega was in no way inconsistent with defendants' having earlier sold the bulk of their Pacheco stock to Birrell; indeed the free and easy tone of the minutes suggests that the company was already in his control. The agency theory, which was propounded in and rejected at trial, runs counter to the written agreement of December 7, 1956, and fails to account for Birrell's possession of certificates for the 2,000,000 shares; and the payments recited in the minutes bear no apparent relation to those proved to have been received by defendants and to have been treated by them as their own property.

Affirmed.