UNITED STATES of America, Appellee,

v.

Cesar TURBIDE and Nelson Perez,
Defendants-Appellants.

Nos. 843, 844, Dockets 76–1533, 76–1534.

United States Court of Appeals,
Second Circuit.

Argued March 1, 1977.

Decided June 22, 1977.

Lawrence W. Kessler, Hempstead, N. Y., for defendant-appellant Turbide.

Jesse Berman, New York City, for defendant-appellant Perez.

Howard W. Goldstein, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MULLIGAN and OAKES, Circuit Judges, and FREDERICK van PELT BRYAN, Senior District Judge.*

FREDERICK van PELT BRYAN, Senior District Judge:

Cesar Turbide and Nelson Perez appeal from judgments of conviction entered on November 1, 1976 in the United States District Court for the Southern District of New York, after a six-day trial before Judge Kevin T. Duffy and a jury.

Count one of the indictment charged Turbide alone with distributing and possessing with intent to distribute 23.63 grams of cocaine on July 17, 1974 in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). Count two charged both Turbide and Perez with distributing and possessing with intent to distribute 50.55 grams of cocaine on February 18, 1975 in violation of the same sections and 18 U.S.C. § 2.

Trial commenced on May 26, 1976. On June 2, 1976, the jury found Turbide guilty on count one. The next day the jury found both Turbide and Perez guilty on count two.[1]

Turbide and Perez each raise one main issue on appeal. Turbide claims that his

---

* Frederick van Pelt Bryan, of the Southern District of New York, sitting by designation.

1. Turbide was sentenced to concurrent terms of imprisonment of three years on each count, to be followed by a special parole term of three years. Perez was sentenced to a term of imprisonment of three years, to be followed by a special parole term of three years.

convictions must be reversed because the district court refused to order the Government to produce at the trial an informer who introduced Turbide to an undercover narcotics officer and participated to a slight extent in the ensuing transactions. Perez seeks reversal of his conviction on the ground that he was prejudiced by the district court's refusal to sever count two of the indictment, the only count in which he was charged, from count one, which charged an unrelated July, 1974 sale by his codefendant Turbide. We affirm both convictions.

## I.

The Government's proof at trial was developed through the testimony of three witnesses—Officer Frank Marrero, and Detectives Robert Bisbee and Michael J. Alberti—New York City police officers assigned to the Department of Justice's Drug Enforcement Task Force. Viewed in its most favorable light, it established that two distinct narcotics transactions occurred, one a rather typical undercover sale and another which departed somewhat from that familiar script.

The events leading up to the first sale began on the evening of July 16, 1974. After meeting briefly with an informer who had been arrested for a narcotics offense and who was cooperating with the Drug Enforcement Task Force while his case was pending, undercover police officer Marrero drove to the Mona Lisa Social Club on 168th Street in Manhattan to meet Cesar Turbide for the purpose of buying cocaine. When he arrived at the club, Turbide was not present, so Marrero asked the informer, who had driven to the club in a separate car, to try to find Turbide. The informer drove up Amsterdam Avenue, and then shortly returned to the club. A couple of minutes after the informer's return, Turbide arrived at the club on a ten-speed bicycle.

Once inside the club, Turbide asked Marrero how much cocaine he wished to purchase. Marrero stated that he wanted to buy one ounce. Turbide said that he could supply an ounce but that the deal would have to take place the following day. Prices of $1,100 or $1,200 were discussed, but the final price was left open.

The next day, July 17, 1974, Marrero again met Turbide at the Mona Lisa. After confirming that Marrero was still ready to buy, Turbide left to get the ounce of cocaine. He rode up to the vicinity of 172nd Street and Amsterdam Avenue on his bicycle, where he spoke to several men in different locations in a park.

After an hour had passed and Turbide had not returned, Marrero asked the informer to "see where Mr. Turbide was" and "find out what the delay was." The informer left the club and drove to the park, where he spoke to Turbide for a few minutes.[2] The informer then returned to the club and told Marrero that Turbide would be arriving shortly.

Turbide remained in the park, where he spoke to the passenger of a Pontiac station wagon which was stopped outside the park. The driver of the Pontiac had the hood of the car up and was working under it. After some five minutes, the driver put the hood down and, with his passenger, sped north on Amsterdam Avenue. Surveillance officers lost them in traffic.

Some time later, the Pontiac, with its hood up again, was parked across the street from the Mona Lisa. Turbide appeared and, after again speaking to the passenger of the Pontiac, entered the club, told Marrero that he had the ounce of cocaine, and asked him to step to the rear of the club. While the informer remained at the front of the club by a pool table, Marrero and Turbide went to the rear.[3]

---

**2.** Detective Bisbee, who observed this conversation, did not see anything pass between the two men.

**3.** Detective Bisbee testified that the Mona Lisa Social Club consisted of two rooms. The smaller of the rooms, the first one entered, contained the pool table. Adjacent to this was the main room of the club, measuring approximately 15 feet by 40 feet, which contained the bar.

There Turbide gave Marrero the ounce of cocaine and said that the price would be $1,200. Marrero told him that all he had was $1,000, but that he would go get the other $200. Turbide agreed to wait, and Marrero gave him the $1,000 and left. He returned shortly, had the informer send Turbide out to his car, and there paid him the balance of $200. Turbide told Marrero that if he wanted to buy any more cocaine he would be in the area and the informer would know how to get in touch with him. After leaving Marrero's car, Turbide again spoke to the occupants of the Pontiac.

The series of events which culminated in the second cocaine sale began on the evening of February 11, 1975. Marrero went to Hector's Bar at 174th Street and Amsterdam Avenue to meet Turbide, who had been previously contacted by the informer. Both Turbide and the informer, who was tending bar, were in Hector's when Marrero arrived. After an exchange of greetings, Turbide asked Marrero how much cocaine he wished to purchase. Marrero told him that he was looking for two ounces. Turbide said that he was able to supply it, but that they had to speak with his partner Nelson at Nelson's grocery store in the Bronx. Marrero and Turbide then drove to Roque's grocery store at 169th Street and College Avenue in the Bronx. The informer did not accompany them.

While Marrero waited in the car outside the grocery store, Turbide went down the block to 1264 College Avenue and came out shortly with Nelson Perez. Turbide introduced Perez to Marrero as Nelson, his partner. Perez told Marrero that he would be able to supply the two ounces of cocaine if Marrero were willing to go to the East Harlem area where his main connection could probably be found. Perez suggested that his cousin Carlos accompany them since Carlos knew the different social clubs in East Harlem that the connection frequented.

Eventually, a red Thunderbird with two male occupants arrived at the grocery store, and Perez introduced one of them to Marrero as his cousin Carlos Ferrer. Then Perez, Ferrer, and the other male drove in the Thunderbird to 102nd Street and Lexington Avenue in Manhattan, followed by Turbide and Marrero in the latter's car, a 1971 Cadillac government undercover vehicle.

After a lengthy search for the connection in various social clubs in the vicinity of 102nd Street proved unsuccessful, the group arrived at a club on 105th Street which Perez, Ferrer, and the third man entered.

While the others were in this club, Turbide apologized to Marrero for the delay. He told Marrero that he was not used to doing business in this fashion, and that Perez was a good source who could possibly secure pure cocaine. After waiting still longer, Marrero asked Turbide to go inside the club and find out what was the reason for the delay. Turbide entered the club and within a few minutes reported to Marrero that Ferrer had been in touch with the connection and that the deal would take place at yet another social club on 102nd Street. Both cars then proceeded to a club on 102nd Street off of Lexington Avenue.

When they arrived at 102nd Street again, Perez and Turbide repeated the apologies to Marrero. Perez assured him that he was not doing anything phony, that the delay was something beyond his control, and that "he is a man of his word and he has a business and a reputation at stake." Perez, joined shortly by Turbide, went into the club. Perez then came out of the club, entered Marrero's car, and instructed him to drive around the block and park directly in front of the social club. He did so, and Perez walked into the club again.

Turbide came out of the club and entered Marrero's car. He told Marrero that the connection would show up shortly. Then, after first telling Marrero that he saw the connection enter the club, Turbide asked for the money in advance. Marrero refused at first, but agreed when Turbide told him that this was the only way the connection would deal and that Marrero could keep $600 of the $2,900 purchase price until he received the cocaine. Turbide took the money and went into the club while Marrero waited in the car.

Next Turbide came out and told Marrero that there would be yet another delay. He then asked Marrero to go into the club with him. They entered the club and joined Perez. Ferrer came over and stated that while there was a delay, the connection would show up and Marrero would get the two ounces. Ferrer then walked away, and Marrero did not see him again.

Marrero told Turbide and Perez that he would only wait another fifteen or twenty minutes. He then left the club to move his illegally parked car. When he returned, he asked Turbide for the $2,300 back. Turbide told him that since Ferrer was Perez's cousin, he had given him the money. Ferrer had then vanished.

An argument ensued over Turbide's authority to give the money to Ferrer. Finally, Perez suggested that they try to find Ferrer. They returned to the College Avenue area of the Bronx, but did not locate Ferrer.

Before they parted company that night, Perez assured Marrero that he would either get the cocaine or his money back, but stated that it would take a couple of days. He asked Marrero to keep in touch with Turbide, which Marrero agreed to do.

The following evening, February 12, 1975, Marrero went to Turbide's home. Turbide said that he had been unable to get the two ounces and did not know what had happened to the money. He suggested that they drive to Perez' grocery store. There Perez again assured Marrero that he would "make good" on the cocaine or the money, but would need a couple of days. Marrero mentioned that the people who had put up the money were getting worried, but Perez promised Marrero that he would get either the cocaine or the money back.

On the evening of February 13, 1975, Marrero met Perez at his grocery store. Perez informed Marrero that both he and Turbide were trying to obtain the cocaine through different connections. Marrero and Perez then went to Turbide's house, where Turbide confirmed that he, too, was trying. Turbide and Marrero met again at midnight at Hector's Bar, but there was still no cocaine and no money.

Marrero then met with other members of the Drug Enforcement Task Force. They agreed that Detective Alberti and Sergeant DeLuca would pose as the persons who supplied Marrero with the money for the cocaine purchase, and accompany him to his next meeting with Turbide.

On the afternoon of February 14, 1975, Marrero, Alberti, and DeLuca went to Hector's Bar. Alberti played the role of Marrero's financial backer, while DeLuca drove the car in which the three men arrived. Turbide was not present in the bar, and two attempts by the informer and officers to locate him proved unsuccessful.

The group then returned to Hector's Bar and saw Turbide approaching. Marrero told Turbide that the people who had put up the money were with him and that they did not believe Marrero's story. He asked Turbide to explain to them what had happened. Turbide repeated the story to Alberti and agreed that he was responsible for the money. Alberti told Turbide that all he wanted was for Turbide "to do the right 'thing," and Turbide suggested that they go to the Bronx to straighten out the matter.

The three officers and Turbide then drove to Perez' grocery store. On the way, Turbide again assured them that "everything will be taken care of" and stated that he would "do what I have to do." Perez was not at the store when they arrived, nor when the officers returned an hour later. Alberti finally told Turbide to meet Marrero on Tuesday, February 18, 1975, and "straighten the whole thing out."

On the evening of February 18, 1975, Marrero met Turbide and Perez at Hector's Bar. Perez told him that he had the two ounces of cocaine and that the sale would take place at Turbide's apartment. The trio then met in front of Turbide's building, and went inside. In the bedroom of the apartment, Perez handed Marrero a bag containing the cocaine while Turbide pulled out a scale from a closet. After the cocaine was weighed, Turbide requested the balance of the $2,900 purchase price—$600.

Marrero gave Turbide and Perez $100 and told them that he would owe them the rest.

Turbide did not call any witnesses or present any evidence at trial. Perez called Sergeant DeLuca in an attempt to establish a defense of coercion. The rather implausible theory was that the defendants had initially intended to keep Marrero's purchase money without ever delivering any cocaine, and had only produced the drugs after the threatening figure of Alberti had entered the picture. DeLuca testified that he drove Marrero and Alberti to the February 14, 1975 meeting with Turbide in the undercover Cadillac which Marrero had used throughout both transactions. He did not recall the details of Alberti's conversation with Turbide. Perez also called Detective Gerald Kieran, who testified that he had arrested Perez and that at the time of his arrest Perez was not armed, had no contraband in his possession, and did not appear to be a drug user.

## II.

Reports of Officer Marrero which outlined the informer's role in this case were turned over to counsel for Turbide pursuant to 18 U.S.C. § 3500 well in advance of trial. Yet it was only after the second day of trial, at the conclusion of Marrero's testimony, that Turbide moved unsuccessfully for production of the informer by the Government. Counsel for Turbide argued that the testimony that day had made the identity of the informer "quite clear", and stated that "Mr. Turbide is under the belief that this is a man known to him as Junior who acted as a bartender frequently . . . ." When Judge Duffy suggested that Turbide subpoena the informer, however, counsel responded:

He doesn't know his last name or where he presently is, and he is not where he once was, that is in 1975. He is no longer at that location. Our understanding is that he is—he is no longer at that location. His present whereabouts are not known, nor is his real name.

After his motion to produce the informer was denied, counsel for Turbide sought to take full advantage of a "missing witness" charge requested by the Government[4] by attempting to establish that the informer was unavailable to the defense. Accordingly, the following exchange took place during the cross-examination of Detective Bisbee by Turbide's counsel:

Q. Do you remember on July 16, 1974, that Detective Marrero met the informant at the informant's house?

A. Yes, originally it started out at his house, yes.

Q. That was before going to the Mona Lisa Social Club?

A. Yes.

Q. The informant isn't living at that house any more, is he?

A. No.

Q. And the reason he moved was so that no one other than representatives of the government would know where he is?

A. Not anyone. He did not want certain individuals to find him.

Q. For instance, the defendants or the defendants' lawyers, anybody like that, is that right?

A. Well, at least the defendants.

Mr. Goldstein: Objection.

The Court: All right, let it go.

In his summation, counsel for Turbide repeated the substance of this testimony, and highlighted the fact that it was permissible for the jury to draw an inference unfavorable to the Government from its failure to call the informer to testify in this case. Verdicts of guilty on both counts followed.

---

**4.** Government's request to charge number 13 included the following language:

If it is peculiarly within the power of either the prosecution or defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness may but need not necessarily, give rise to an inference that his testimony would be unfavorable to that party. However, no such inference should be drawn by you with regard to a witness who is equally available to both parties.

Judge Duffy later charged the jury *in haec verba*.

On appeal, Turbide contends that his convictions on both counts must be reversed because the district court erroneously refused to order the Government to produce the informer. He asserts that the Government was not privileged to withhold production of the informer since Turbide knew him as "Junior", a bartender at Hector's Bar. Alternatively, Turbide argues that even if the informer's privilege were initially applicable, it had to give way because the informer's extensive involvement in the first sale made his production essential to a fair trial.[5]

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court defined the privilege at issue in this case:

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. . . . The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.
>
> The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

353 U.S. at 59, 77 S.Ct. at 627 (citations omitted).

■ The Court went on to say that the "scope of the privilege is limited by its underlying purpose." 353 U.S. at 60, 77 S.Ct. at 627. Thus, if the contents of a communication by the informer with the authorities could be revealed without unveiling his identity, those contents would not be privileged. Similarly, if the identity of the informer has already become known to those who would have reason to resent his communication with the authorities, the privilege is no longer. applicable. *Id.*

A further limitation on the applicability of the privilege is mandated by fundamental requirements of fairness:

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and if the Government withholds the information, dismiss the action.

353 U.S. at 60–61, 77 S.Ct. at 628 (footnotes omitted). The *Roviaro* Court emphasized, however, that "no fixed rule with respect to disclosure is justifiable," 353 U.S. at 62, 77 S.Ct. at 628, and that the determination must be made on a case-by-case basis:

> The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.*

■ Turbide first argues that the privilege is inapplicable in the case at bar because it became apparent during the course of the trial that the informer was a person known to him as "Junior", a bartender at Hector's Bar. We cannot agree. All that Turbide knew was the informer's nickname and his former place of employment, and this must be true in most narcotics cases. *See, e. g., United States v. Fredia,* 319 F.2d 853 (2d Cir. 1963) ("Sally"); *United States*

---

5. While acknowledging that the informer's participation in the 1975 transaction was much less than in the initial sale, Turbide contends that his convictions on both counts must nevertheless be reversed if the refusal to order production of the informer were erroneous. He reasons that any defense to the first sale of entrapment (at one point specifically disclaimed by Turbide) or coercion which the informer's testimony might have established would also apply to the second sale, which he characterizes as merely a continuation of the prior negotiations.

v. Alexander, 495 F.2d 552 (2d Cir. 1974) ("Randy"); United States v. Morell, 524 F.2d 550 (2d Cir. 1975) ("Louie"). We find such a showing of limited knowledge of the informer's identity insufficient to extinguish the privilege and strip the informer of the protection it affords.[6]

Turbide contends alternatively that if the privilege were applicable it had to give way because the informer's extensive involvement in the 1974 transaction made his production essential to a fair determination of the charges against Turbide.

■ An initial distinction must be drawn between a motion to compel disclosure of an informer's identity or whereabouts and a motion to compel production of the informer himself. Unless an informer's testimony would be relevant and helpful to the defense or, as is claimed here, essential to a fair trial, Roviaro has no application, see United States v. Casiano, 440 F.2d 1203, 1205 (2d Cir.), cert. denied, 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971), and defense motions for identification, disclosure of the whereabouts, or production of the informer can be summarily denied. United States v. Ortega, 471 F.2d 1350, 1359 (2d Cir. 1972), cert. denied, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973).

■ Even when the Roviaro test is met the Government does not become the guarantor of its informer's presence at trial, United States v. Russ, 362 F.2d 843, 844 (2d Cir.), cert. denied, 385 U.S. 923, 87 S.Ct. 236, 17 L.Ed.2d 146 (1966), and does not have a duty to produce him. United States v. Cimino, 321 F.2d 509, 512 (2d Cir. 1963), cert. denied, D'Ercole v. U. S., 375 U.S. 967, 974, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964); United States v. Prada, 451 F.2d 1319, 1320–21 (2d Cir. 1971); United States v. Ortega, supra, at 1358–59 n. 2; United States v. Super, 492

F.2d 319, 321 (2d Cir.), cert. denied, Burns v. U. S., 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 115 (1974). But see United States v. Rosario, supra, at 564 ("Indeed, there may be cases where the government would be under a duty to produce the informer, if it is able to do so."). All that the defendant is entitled to under such circumstances is the informer's name, such information as the Government may have concerning his whereabouts, and reasonable cooperation in securing his appearance. United States v. D'Angiolillo, 340 F.2d 453, 455 (2d Cir.), cert. denied, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965), quoted with approval in United States v. Ortega, supra, at 1358–59 n. 2.

■ The question then is whether "Junior's" involvement in the transactions at issue entitled Turbide to such assistance from the Government in obtaining his presence at trial under Roviaro.

We conclude that it did not. The informer in Roviaro was the sole participant, other than the accused, in the narcotics transaction charged. He not only set up the sale, but actually purchased the drugs from the defendant. While a police officer hidden in the trunk of the car overheard the conversation between the informer and Roviaro as the sale took place, and other officers observed from a distance, the informer remained the only eye-witness to the actual sale.

In contrast, the role of Junior in the present case was minor. Although he was in the Mona Lisa at the time of the 1974 sale, Junior could not well have observed the sale at the rear of the club from his position by the pool table, and he remained in the club when the final $200 was transferred to Turbide in Marrero's car. His two searches for Turbide, along with the con-

---

**6.** Even were we to assume that Turbide possessed sufficient knowledge of the informer's identity to defeat the privilege, he still failed to fulfill a precondition to obtaining the Government's aid in securing the informer's presence at trial. A defendant who knows the informer must show that he made a diligent attempt to locate him before relief will be ordered under Roviaro. See United States v. Rosario, 327

F.2d 561, 563–64 (2d Cir. 1964); United States v. De Angelis, 490 F.2d 1004, 1010 (2d Cir.), cert. denied, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974). Turbide made no such showing, and his contention that any attempt to find the informer would have been futile because he was being intentionally hidden by the Government is simply not supported by the record.

versations these entailed, and his presence in the club at the time of the sale marked Junior as somewhat more than a "mere introducer", but his participation in the transaction itself was far from extensive and his testimony was hardly essential to a fair trial. On these facts, the district court properly exercised its discretion in refusing to order disclosure under *Roviaro*. See *United States v. Simonetti*, 326 F.2d 614 (2d Cir. 1964); *United States v. Coke*, 339 F.2d 183 (2d Cir. 1964); *United States v. Soles*, 482 F.2d 105, 108–110 (2d Cir.), *cert. denied*, 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973); *United States v. D'Amato*, 493 F.2d 359, 366 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974); *United States v. Edmonds*, 535 F.2d 714, 718–19 (2d Cir. 1976); *United States v. Gonzalez*, 555 F.2d 308 (2d Cir., 1977).

### III.

Perez' principal contention is that he was prejudiced by the misjoinder of count two, charging the February, 1975 sale by both defendants, with count one, charging the apparently unrelated July, 1974 sale by Turbide alone. He argues that his motions for severance or mistrial were improperly denied since prejudice resulted from the admission of testimony concerning the July, 1974 sale without appropriate limiting instructions, and from the answer given by Bisbee to the question by Turbide's counsel as to why the informer moved, which he views as suggesting that both defendants were dangerous persons.

The Government takes the position that, even assuming that the joinder in the same indictment of the counts alleging the two separate sales was improper,[7] Perez was not prejudiced and any error was harmless under Fed.R.Crim.P. 52(a).

It is well settled in this circuit that the harmless error doctrine applies to misjoinder of counts under Fed.R.Crim.P. 8(b). In three separate decisions, this court has concluded that when evidence tending to prove the charge that should have been severed would nevertheless have been admissible at the trial of the objecting codefendant, and was admitted subject to appropriate limiting instructions, any error was harmless. *United States v. Granello*, 365 F.2d 990, 995 (2d Cir. 1966), *cert. denied*, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967); *United States v. Weiss*, 491 F.2d 460, 467 (2d Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974); *United States v. Payden*, 536 F.2d 541, 543 (2d Cir.), *cert. denied*, 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). *Cf. Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), which the *Granello* court characterized as implying that the harmless error rule was applicable to questions of improper joinder.

Even if count one had been severed from count two in the instant case, "similar act" evidence relating to the July, 1974

---

7. Fed.R.Crim.P. 8 provides:

    Joinder of Offenses and of Defendants

    (a) *Joinder of Offenses*. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

    (b) *Joinder of Defendants*. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

    When a defendant in a multiple defendant case challenges joinder of offenses, however, his motion is made under Rule 8(b) rather than Rule 8(a), *United States v. Papadakis*, 510 F.2d 287, 300 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), and the question is whether the codefendants "participated . . . in the same series of acts or transactions constituting an offense or offenses."

    *King v. United States*, 355 F.2d 700 (1st Cir. 1966), along with *United States v. Gentile*, 495 F.2d 626 (5th Cir. 1974) and *United States v. Bova*, 493 F.2d 33 (5th Cir. 1974), indicate that the counts here were in fact misjoined. *Contra, United States v. Roell*, 487 F.2d 395 (8th Cir. 1973).

transaction still would have been admissible against Turbide, subject to limiting instructions, at a joint trial of Turbide and Perez on count two. *See, e. g., United States v. Chestnut,* 533 F.2d 40, 49 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Santiago,* 528 F.2d 1130, 1134 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Payden, supra,* at 543; *United States v. Papadakis, supra,* at 294. Contrary to Perez' claim, Judge Duffy gave appropriate limiting instructions,[8] and the pattern of jury deliberations and communications strongly indicates that these instructions were effective.[9] Under these circumstances, no prejudice from the joinder of offenses per se could have occurred.

Perez further contends, however, that he was irremediably prejudiced by Bisbee's answer when asked why the informer had moved to the effect that he did not want "the defendants" to find him, and the subsequent comments upon this statement made by counsel for Turbide and the prosecutor. Perez claims that this line of inquiry would never have been followed had his motion for a severance been granted, and

8. In his preliminary instructions to the jury at the start of the case, Judge Duffy stated:
> You must not be influenced by any degree of personal feeling or sympathy for or prejudice against the government or any defendant in this case. Each is entitled to impartial consideration. Each defendant must be considered separately.

Then, when the first testimony concerning the July, 1974 events was received, the following exchange took place between counsel for Perez and the court in the presence of the jury:
> Mr. Berman: May we have an instruction that as to these July, 1974, events, that none of this testimony is coming in against Mr. Perez?
> The Court: He hasn't mentioned Mr. Perez. All he said is Mr. Turbide. I assume the jury understands that.

This instruction was substantially repeated on the morning of the second day of trial when Marrero began his testimony. After Marrero identified Turbide in connection with the first sale, the following colloquy took place before the jury:
> Mr. Berman: Your honor, perhaps this is an appropriate time to remind the jury that all this testimony about the July, 1974 episode is not being offered against Mr. Perez.
> The Court: That's true.

Later, several different portions of Judge Duffy's charge emphasized to the jury the importance of giving separate consideration to each defendant and each alleged offense:
> I said this at the beginning of the trial, and I will repeat it: guilt is personal. The guilt or innocence of each of these defendants here on trial must be determined with respect to him solely on the evidence presented against him or the lack of evidence. The charges against him stand or fall upon the proof or lack of proof against him and not as to proof against someone else.
> * * * * *
> As I just stated, the first count charges Cesar Turbide and the second count charges both Cesar Turbide and Nelson Perez. I must remind you that you must consider each count separately, and with respect to the second count you must consider each defendant separately.
> * * * * *
> [N]or may guilt be inferred from mere association with another.
> * * * * *
> You must consider each count separately and render a separate verdict as to each count. You must consider each individual separately and render a separate verdict as to each defendant.

Perez had only requested that the jury be instructed in this connection that "[g]uilt may not be inferred from mere association with another," and that "you must consider the evidence against each defendant individually."

9. The fact that the jury considered each count separately is demonstrated by its return of a verdict on count one at approximately 4:30 P.M. on June 2, its continued deliberation until 10 P.M. that evening, its resumption of deliberations at approximately 10 A.M. on June 3, and its return of verdicts on count two at 12:15 that afternoon.

The separate consideration given to each defendant by the jury is suggested by its June 2 note which announced that it had arrived at a partial verdict. The note stated:
> We have reached a verdict on one count. At this po[i]nt we are in disagreement on the other *counts* and cannot seem to resolve our difficulties. Can you instruct us? Where do we go from here? (emphasis added)

This indicates that the jury had correctly broken the case down into three separate issues which had to be decided: the charge against Turbide in count one; the charge against Turbide in count two; and the charge against Perez in count two. Counsel for Turbide had stressed this analysis ("[Y]ou are not dealing with one case, you are dealing with three at the same time. Two charges against Mr. Turbide and one against Mr. Perez.") in his opening statement to the jury.

argues that the response given by Bisbee was inaccurate because there was no evidence to suggest that he had a motive to harm the informer. The possibility of prejudice resulting from this exchange is established, according to Perez, by Judge Duffy's own reaction to it, which included a decision, made out of the presence of the jury and later reversed, to remand both defendants.

We are unconvinced. While the question might not have been asked of Bisbee at a separate trial on count two,[10] the only contemporaneous objection was lodged by the prosecutor. It was not until much later that counsel for Perez moved for a mistrial because of the effect of the question concerning the informer's reason for changing his address.[11] Plainly, the allegedly devastating impact of this testimony was not immediately apparent to Perez' counsel, nor is it apparent to us. It seems likely to us that if any informer sets up the prosecution of any defendant, no matter how unblemished that defendant's record and reputation for peacefulness might be, the informer would still seek to avoid the defendant, and a jury in this district would expect as much. Nor is Perez correct in asserting that Bisbee's answer was inaccurate because he had no motive to harm the informer. "Junior" had again played a role, albeit a smaller one, in the February, 1975 transaction, and it must have been painfully obvious that this time he had set up both Turbide and his partner Perez. Again, in view of the record, we cannot agree with Perez that this testimony was of critical importance. After reviewing the evidence against Perez, which revealed that he played the leading role in the 1975 sale, and the weakness of his coercion defense, which was fairly presented to the jury yet rejected,[12] we conclude that any error arising from misjoinder was harmless beyond a reasonable doubt. *See United States v. Ong,* 541 F.2d 331, 338 (2d Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

Two other points raised by Perez merit only brief discussion. After the jury's deliberations had been underway for less than three hours, it sent the court a note requesting redefinition of coercion and reasonable doubt. Without first revealing the note's contents to counsel, Judge Duffy read the note and recharged the jury on these points in open court in the presence of all counsel and the defendants. While it might have been the better practice to reveal the note to counsel and elicit their views before taking any action, *United States v. Robinson,* 560 F.2d 507 (2d Cir. 1977) (en banc), we find no ground for reversal since the note only requested a redefinition of applicable law and did not present counsel with any tactical decision. *See United States v. Rodriguez,* 545 F.2d 829 (2d Cir. 1976). Judge Duffy's supplemental coercion and reasonable doubt charges correctly stated the law of this

10. It is certainly possible that counsel for Turbide would have inquired into the unavailability of the informer if the July, 1974 transaction were proved as a prior similar act of Turbide at a joint trial of the defendants on count two.

11. In the interim, the Government had rested; a robing room conference covering the expected length of defense cases and summations and rulings on defense motions and requests to charge had been held; the jury had been dismissed for lunch; further discussion had taken place among counsel; Judge Duffy had made and reversed his decision to remand the defendants; and a luncheon recess had been taken.

12. Perez requested and received a "standard" instruction on coercion or duress:

Coercion or compulsion may provide a legal excuse for the crime charged in an indictment. In order to provide a legal excuse for any criminal conduct, the compulsion must be present, immediate, and of such a nature as to induce a well-founded fear of impending death or serious bodily injury. There must be no reasonable opportunity to escape the compulsion without committing the crime or participating in the commission of the crime. The testimony elicited from the police officers by defense counsel fell woefully short of establishing the specific threat of immediate use of force which serves as a basis for the defense of coercion, particularly in view of the numerous opportunities afforded Turbide and Perez to avoid committing any offense. *See United States v. Housand,* 550 F.2d 818, 824–25 (2d Cir. 1977).

circuit. The defendants were not entitled to the instructions given in the original reasonable doubt charge which were omitted from the supplemental charge.[13] *See, e. g., United States v. Siragusa,* 450 F.2d 592, 596 (2d Cir. 1971), *cert. denied,* 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972); *United States v. Hart,* 407 F.2d 1087, 1091 (2d Cir.), *cert. denied,* 395 U.S. 916, 89 S.Ct. 1766, 23 L.Ed.2d 231 (1969); *United States v. Acarino,* 408 F.2d 512, 517 (2d Cir.), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969).

The judgments of conviction are affirmed.

**13.** In his original charge, Judge Duffy had instructed the jury

[I]f you do not have an abiding conviction of the defendant's guilt which amounts to a moral certainty  .  .  .  it is your duty to acquit. If you as a juror considering all of the evidence can draw two conclusions from all the evidence, one of guilt and one of innocence, then you must adopt the one of innocence and acquit the defendant.